# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW HAMPSHIRE

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

DANIEL J. PHILBRICK AND DOVER
SPORTS, INC., D/B/A PHILBRICK'S
SPORTS

              Plaintiffs,

    v.

ENOM, INCORPORATED

          Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Docket No.: 1:07-cv-00215-JL

## ENOM, INC.'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

Steven M. Gordon
SHAHEEN & GORDON, P.A.
107 Storrs Street
Concord, NH 03302
Telephone: (603) 225-7262

-and-

Paul D. McGrady, Jr. (*Pro Hac Vice*)
Jeffrey P. Dunning (*Pro Hac Vice*)
Jason B. Elster (*Pro Hac Vice*)
GREENBERG TRAURIG, LLP
77 West Wacker Drive, Suite 2400
Chicago, IL 60601
Telephone:  (312) 456-8400

Attorneys for Defendant ENOM, INC.

## I.    ENOM'S STATEMENT OF UNDISPUTED MATERIAL FACTS

### A.    eNom

eNom is a Nevada corporation whose principal place of business is located in Bellevue, Washington.  (Ans., Dkt. No. 8, ¶4).  eNom is a domain name registrar, meaning that it has been accredited by the Internet Corporation for Assigned Names and Numbers (ICANN)[1] to register Internet domain names on behalf of third party registrants.  (Ex. 1, Decl. of C. Ursini, ¶3 ("Ursini Decl.");  *see also* Ans. at ¶¶15-18; Ex. 2, M. Blend, pp. 8:21-9:6).  As an ICANN-accredited domain name registrar, eNom receives requests to register domain names on behalf of third-party registrants (Ex. 1, Ursini Decl., ¶¶4-7; *see also* Ex. 3, eNom Reg. Agmt., ENOM 000045-51; eNom Auction Agreement, ENOM 000052-59).

The process of assigning domain names is overseen by entities known as domain name registries.  (Ex. 1, Ursini Decl., ¶5).  When one of eNom's customers requests a domain name from eNom, eNom attempts to acquire that domain name from a registry.  (*Id.*).  If eNom successfully acquires a domain name from the registry on behalf of its customer, then eNom is required to identify that customer as the registrant in the publicly-available WHOIS data.  (*Id.*).

As a registrar, eNom occasionally holds domain names that it originally registered on behalf of a third party in its own account.  (Ex. 1, Ursini Decl., ¶8).  These domain names are then associated with a web page, which typically will include a search function and links to advertisements found on other web pages.  (*Id.*, ¶9).  eNom does not generate the content of those web pages; rather, the content is generated by Yahoo! Inc. ("Yahoo!"), formerly known as Overture Services, Inc., pursuant to a contractual agreement between eNom and Yahoo!  (*Id.*).

---

[1] ICANN is a non-profit corporation responsible for managing the assignment of domain names and IP addresses.

eNom does not sell products through any of those websites, and users who visit those websites cannot purchase any products from eNom. (Ex. 1, Ursini Decl., ¶10). If visitors to those websites click on advertising links that appear on those sites (again, generated by Yahoo!), they are directed to other websites operated by third parties, not eNom. (*Id*.).

**B.    The Disputed Domains**

On or about November 23, 2005, an eNom customer identifying itself as RareNames instructed eNom, in its capacity as a domain name registrar, to register the domain names <philbricksports.com> and <philbricksports.net> (the "Disputed Domains") for RareNames (Ex. 4, Decl. of R. West, ¶¶4-7 ("West Decl."); Ex. 5, Decl. of C. Mitchell ¶¶6-8 ("Mitchell Decl.")). RareNames is not owned by or otherwise affiliated with eNom. (Ex. 5, Mitchell Decl., ¶8).[2] RareNames failed to pay eNom's registration fee and did not assume ownership of the Disputed Domains. (Ex. 1, Ursini Decl., ¶11).

The following day, eNom deleted the <philbricksports.net> domain name, which was then returned to the registry and made available for registration by other parties. (Ex. 5, Mitchell Decl., ¶10); *see also* Ex. 6, ENOM 000234 (showing the deletion date for <philbricksports.net>). The <philbricksports.com> domain name was maintained in eNom's own account, and associated with a webpage on which content generated by Yahoo! was accessible, until August 2007. (Ex. 5, Mitchell Decl., ¶11).

**C.    Philbrick's Use of the "Hockey.com" and "Philbrick's Sports" Names**

Daniel J. Philbrick ("Mr. Philbrick") is an individual residing in Dover, New Hampshire, and is the owner and operator of Dover Sports, Inc. ("Dover Sports") (collectively referred to as "Plaintiffs" or "Philbrick"), a sporting goods business. Dover Sports operates a single retail

---

[2] eNom successfully acquired the Disputed Domains from the domain name registry, VeriSign, Inc. on behalf of RareNames (Ex. 5, Mitchell Decl., ¶¶9-11).

outlet in Dover, New Hampshire under the name "Philbrick's Sports Center." *See* Ex. 7, 30(b)(6) Dover Sports, pp. 23:8-23:12. While "Philbrick's Sports Center" may be a well-known business in the Dover, New Hampshire area, Plaintiffs have produced no evidence that their store has any reputation outside of New England. Moreover, Plaintiffs never obtained or even applied for a federal trademark registration for either "Philbrick's Sports" or "Philbrick's Sports Center," and the store is not associated with any national or federally-registered trademarks. *See* Ex. 8, Pl. Resps. to eNom, Inc.'s First Set of Req. for Adm., Nos. 1-2, 21-24.

While Philbrick has advertised its retail store through newspaper and radio outlets in New England, there is no evidence that any of its advertisements were ever disseminated anywhere outside of New England, or that any consumers outside of New England have ever been exposed to any of those ads. *See* Ex. 9, Pl. Resp. to Int. No. 13 (listing advertising outlets where Plaintiffs promoted, advertised, and/or marketed their goods and services since January 1, 2000); Ex. 7, 30(b)(6) Dover Sports, pp. 246:1-250:5. Plaintiffs also operate an informational Internet website associated with the domain name <philbricks.net>. (Complaint, Doc. No. 1, ¶3; Ex. 10, M. Langley, pp. 21:9-21:23, 63:8-66:6).

From March 2002 through October 2005,[3] all of Philbrick's online sales were made through a single Internet website associated with the domain name <hockey.com>. *See* Ex. 10, M. Langley, pp. 61:5-72:14. During the period of time that Plaintiffs owned the <hockey.com> domain name and operated the <hockey.com> website, the only goods sold through that website were hockey-related goods. *See* Exh. 10, M. Langley, pp. 35:19-36:20, 46:8-46:15; Ex. 14, K.

---

[3] Plaintiffs testified at their depositions that the purchase and sale dates for <hockey.com> were a "matter of record." Ex. 10, M. Langley, 61:5-62:10; Ex. 7, 30(b)(6) Dover Sports, 38:3-39:16; Ex. 11, G. Philbrick, 16:3-17:12. The purchase and sale records produced by Plaintiffs reflect that Philbrick purchased <hockey.com> on March 11, 2002 and sold it on October 5, 2005. *See* Ex. 12, PHILBRICK 07040-07049 (March 11, 2002 Asset Purchase Agreement, Warranty Bill of Sale, and Registrant Name Change Agreement for <hockey.com>; Ex. 13, PHILBRICK 07050-07062 (October 5, 2005 Purchase Agreement and Promissory Note for the sale of <hockey.com>).

3

Ruel, pp. 14:23-15:19.  The name "Philbrick's Sports" did not appear on the front page (or "home page") of the <hockey.com> website.  *See* Exh. 10, M. Langley, pp. 77:7-77:21.  Similarly, customers receiving shipments of products purchased through the <hockey.com> website received receipts displaying the name "Hockey.com" and not "Philbrick's Sports," "Philbrick's Sports Center," or "Dover Sports."  *See* Exh. 10, M. Langley, pp. 83:7-84:19; Exh. 7, 30(b)(6) Dover Sports, pp. 42:7-43:10.  While the <philbricks.net> informational website contained links to the <hockey.com> website, Internet users could not purchase any products through the <philbricks.net> website.  *See* Exh. 10, M. Langley, pp. 69:18-72:14.

## II.    LEGAL STANDARD

"Summary judgment is appropriate where the record shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  *De-Jesus-Adorno v. Browning Ferris Indus. of P.R., Inc.*, 160 F.3d 839, 841 (1st Cir. 1998).  Rule 56(e) of the Federal Rules of Civil procedure specifically provides that on a motion for summary judgment:

> an adverse party may not rest upon the mere allegations or denials of his pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial . . ..

As the First Circuit has noted, "[a] genuine issue of material fact does not spring into being simply because a litigant claims that one exists.  Neither wishful thinking nor mere promise[s] to produce admissible evidence at trial . . . nor conclusory responses unsupported by evidence . . . will serve to defeat a properly focused Rule 56 motion."  *Griggs-Ryan v. Smith*, 904 F.2d 112, 115 (1st Cir. 1990) (internal quotations and citations omitted).  In the Rule 56 context, a factual issue is not "genuine" unless "the evidence is such that a reasonable jury could return a verdict for the nonmoving party, and a factual issue is not "material" unless "it might affect the outcome of the suit under the governing law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

4

248 (1986).  As explained below, there is no genuine issue of material fact relevant to any of the issues addressed in this Motion, and the Court should therefore grant summary judgment in favor of eNom on each Count of Plaintiffs' Complaint.

### III.   ENOM, AS A DOMAIN NAME REGISTRAR, IS IMMUNE FROM MONETARY LIABILITY FOR REGISTERING THE DISPUTED DOMAINS

Section 32(2) of the Lanham Act, 15 U.S.C. § 1114(2), provides certain limitations on remedies for claims brought under either the ACPA, 15 U.S.C. § 1125(d), or under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).  It specifically provides an immunity for domain name registrars such as eNom from liability for damages under the Lanham Act for registration of a domain name for a third party "absent a showing of bad faith intent to profit from such registration or maintenance of the domain name." 15 U.S.C. § 1114(2)(D)(iii).  "This effectively codifies the pre-2000 case law . . . which held that a registrar that reserved or registered an allegedly infringing domain name was not responsible as a direct or contributory trademark infringer."  1 J. THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 25:73.40.  It is undisputed that eNom registered the domains at issue in its capacity as a registrar at the direction of RareNames, a third party.  Hence, absent proof of a bad faith intent to profit from the domains at issue, eNom is immune from liability for damages for Philbrick's claims brought under the Lanham Act, including its ACPA claim under 15 U.S.C. § 1125(d) (Count I) and its claims under 15 U.S.C. § 1125(a) (Counts III and IV).

The bad faith intent contemplated by the ACPA is a "bad faith intent to profit from **specific marks**." *Lockheed Martin Corp. v. Network Solutions, Inc.*, 141 F. Supp. 2d 648, 654 (N.D. Tex. 2001) (emphasis added) (granting summary judgment for registrar where there was no evidence of intent to profit from the specific mark at issue).  Here, Philbrick has identified no evidence that any employee or agent of eNom had any knowledge of Philbrick and/or its use of

the "Philbrick's Sports" name in November, 2005. Indeed, when asked at deposition whether he had any such evidence, Mr. Philbrick admitted that he did not. *See* Exh. 7, 30(b)(6) Dover Sports, pp. 305:8-305:17.

While Philbrick has intimated that the Court can infer a bad faith intent to profit based on eNom's business model, this argument is unavailing. Congress specifically chose to immunize domain name registrars from liability for damages based on their business model when it enacted the ACPA; hence, it could not have contemplated that such a business model can form the basis of the necessary element of bad faith. Such a tortured reading of the statute would render the safe harbors found in Section 1114 meaningless.

To the extent that Philbrick has a claim against any party for bad faith registration of the Disputed Domains, that claim is against RareNames, not eNom. *See Lockheed Martin*, 141 F. Supp. 2d at 655 ("The word 'registers' when considered in context, obviously refers to a person who presents a domain name for registration, not to the registrar."). Philbrick has chosen not to pursue that claim. Congress has mandated that eNom cannot be liable under the ACPA for registering the Disputed Domains on behalf of a third party registrant, RareNames. Accordingly, eNom is entitled to summary judgment on Philbrick's ACPA and Lanham Act claims.

## IV. ENOM IS ENTITLED TO SUMMARY JUDGMENT ON PHILBRICK'S ACPA CLAIMS

### A. eNom Did Not Have a Bad-Faith Intent to Profit From "Philbrick's Sports"

In order to prevail on its ACPA claims, Philbrick must prove that eNom had a "bad faith intent to profit from [Philbrick's] mark." 15 U.S.C. § 1125(d)(1)(A)(i). Courts that have construed the ACPA have consistently held that there can be no bad faith intent to profit from another's mark where the defendant had no knowledge of the plaintiff or the plaintiff's mark at the time that it registered or used the domain name at issue. *See Vista India v. Raaga, LLC*, 501

6

F. Supp. 2d 605, 622 (D.N.J. 2007) (finding no bad faith intent to profit where the defendant was "not aware of [plaintiff's] lone store in Edison, New Jersey" when he registered the domain name at issue); *Ultimate Living Int'l v. Miracle Greens Supplements, Inc.*, No. 3:05-CV-1745-M, 2007 WL 14258 at *7-8 (N.D. Tex. Jan. 3, 2007) (noting that, to prevail under the ACPA, plaintiff must show that the defendant learned of its mark before adopting the domain name).

Here, Philbrick has identified no evidence that any employee or agent of eNom had any actual knowledge of Philbrick and/or its use of the "Philbrick's Sports" name. As stated in Sec. IV.A, *supra*, when asked at deposition whether he had any such evidence, Mr. Philbrick admitted that he did not. *See* Exh. 7, 30(b)(6) Dover Sports, pp. 305:8-305:17. Accordingly, because it is undisputed that eNom did not have a bad faith intent to profit from the "Philbrick's Sports" mark, eNom is entitled to summary judgment on Plaintiffs' claims under the ACPA.

### B.    eNom Is Not Liable Under the ACPA Because it Did Not Register, Use or Traffic In the Disputed Domains

In order to be liable under the ACPA, plaintiffs must prove that eNom registered, trafficked in, or used the Disputed Domains. Because the undisputed facts show that it did not, eNom is entitled to summary judgment on this claim.

As discussed in Sec. I.B, *supra*, eNom registered the Disputed Domains at the request of a third party, RareNames, in eNom's capacity as an ICANN-accredited registrar. In fact, <philbricksports.net> was deleted within a day of the time it was registered for RareNames, as soon as it became apparent that RareNames would not pay eNom's registration fee. Courts have recognized that "a registrar who simply accepts the registration of a domain name generally is not liable for . . . violations of the ACPA." *American Girl, LLC v. Nameview, Inc.*, 381 F. Supp. 2d 876, 881-82 (E.D. Wis. 2005) (denying request for TRO because Plaintiff had no likelihood of success on the merits of its ACPA claim against a registrar); *See Lockheed Martin*, 141 F.

7

Supp. 2d at 655 ("The word 'registers' when considered in context, obviously refers to a person who presents a domain name for registration, not to the registrar."); *see also* McCarthy, § 25:73.40 (4th ed. 2007) ("[A] registrar's act of registration of a domain name for another is not the kind of act of 'registration' prohibited by the ACPA."). Accordingly, eNom cannot be held liable for violating the ACPA with respect to any purported registration of those domain names.

Under the ACPA, a party can be liable for "use" of a domain name only if it is the registrant or the registrant's authorized licensee. 15 U.S.C. § 1125(d)(1)(D); *see also Bird v. Parsons*, 289 F.3d 865, 880-81 (6th Cir. 2002) (finding registrar could not be liable under ACPA because a registrar that registers a name on behalf of a third party does not "use" the domain name). Again, eNom was not the registrant of the Disputed Domains; rather, it registered the domains on behalf of RareNames, nor was eNom an authorized licensee. Therefore it cannot be liable under the ACPA for any "use" of those domain names.

Additionally, the term "traffics in" as used in the ACPA means to engage in a transaction including but not limited to sales, purchases, loans, pledges, licenses, exchanges of currency, and any other transfer for consideration or receipt in exchange for consideration. 15 U.S.C. § 1125(d)(1)(E).[4] Because Philbrick cannot identify any evidence showing that eNom ever engaged in any of those activities with regard to the Disputed Domains, eNom likewise cannot be liable under the ACPA for "trafficking in" the Disputed Domains.

### C.    eNom Cannot Be Liable Under the ACPA Because "Philbrick's Sports" Was Neither Distinctive Nor Famous in Washington State in November 2005

Liability under the ACPA may be imposed only if the plaintiff's purported mark was distinctive or famous "**at the time of registration** of the domain name." 15 U.S.C. §

---

[4] For example, offering to sell a domain name constitutes "trafficking in" that domain name. *Id.*; *see also Ford Motor Co. v. Greatdomains.Com, Inc.*, 177 F. Supp. 2d 635, 645 (E.D. Mich. 2001) ("The phrase 'traffics in' contemplates a direct transfer or receipt of ownership interest in a domain name [such as a sale] to or from the defendant.").

8

1125(d)(1)(A)(ii) (emphasis added). Moreover, this inquiry must focus on whether the plaintiff's mark was distinctive at the location of the defendant. *See Vista India*, 501 F. Supp. 2d at 618 (noting that a plaintiff "must establish secondary meaning in a mark *at the time and place* that the *defendant began* use of the mark") (quoting *Commerce Nat'l Ins. Servs. v. Commerce Ins. Agency, Inc.*, 214 F.3d 432, 438 (3d Cir. 2000)) (emphasis in original).

A plaintiff who has not perfected nationwide trademark rights by registering its mark with the U.S. Patent and Trademark Office cannot assert rights against a defendant under the ACPA which it could not assert under traditional trademark law. *Maruti.com v. Maruti Udyog Ltd.*, 447 F. Supp 494, 498 (4th Cir. 2006) (holding that an unregistered mark must meet two requirements to be afforded protection under the ACPA: (1) it "must be used in commerce," and (2) "it must be distinctive"). Because Philbrick cannot prove that "Philbrick's Sports" was distinctive or famous in Washington State in November 2005, eNom is entitled to summary judgment on Philbrick's ACPA claims.

### 1. Descriptive Marks Such as "Philbrick's Sports" Are Considered Non-Distinctive Without a Showing of Secondary Meaning

In order for a mark to be entitled to protection, it must be distinctive. *Bay State Savings Bank v. Baystate Fin. Servs., LLC*, 484 F. Supp. 2d 205, 213 (D. Mass. 2007) (citing *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 769 (1992); *Borinquen Biscuit v. M.V. Trading Corp.*, 443 F.3d 112, 116 (1st Cir. 2006)). A mark is considered distinctive if it "either is inherently distinctive or exhibits acquired distinctiveness gained through secondary meaning." *Id.*

A descriptive mark is considered non-distinctive unless the owner can make an affirmative showing of secondary meaning. *Id.* A mark is descriptive if it "conveys an immediate idea of the ingredients, qualities or characteristics of the services." *Ligotti v. Garofalo*, 562 F. Supp. 2d 204, 215 (D.N.H. 2008). Surnames are classified as descriptive word

9

marks.  *See Perini Corp. v. Perini Constr., Inc.*, 915 F.2d 121, 124 (4th Cir. 1990).  Thus, a mark consisting of a surname and other descriptive matter is by definition descriptive.  *See Christopher D. Smithers Found., Inc. v. St. Luke's-Roosevelt Hosp. Ctr.*, No. 00 Civ. 5502, 2003 WL 115234, *7 (S.D.N.Y. 2003) (holding that the "Smithers Foundation" mark is descriptive because it contains "the descriptive 'Smithers' surname and the descriptive word 'Foundation'"); *Jefferson Bankshares, Inc. v. Jefferson Sav. Bank*, 1989 WL 222446, 14 U.S.P.Q.2d (BNA) 1443, *16-17 (W.D. Va. 1989) (holding that the composite mark "Jefferson National Bank" is descriptive because it is merely a combination of a famous surname and two descriptive terms). It is indisputable that "Philbrick's Sports", consisting of a surname and the generic term "sports" (describing the merchandise which Philbrick sells) is a descriptive mark.

A plaintiff asserting rights in a descriptive mark has the burden of establishing that its mark has acquired secondary meaning.[5]  *Bay State*, 484 F. Supp. 2d at 214.  A court may determine on summary judgment that a party is unable to demonstrate that its mark has acquired secondary meaning.  *See id.* at 218 (holding plaintiff could not establish its mark had acquired secondary meaning before defendant began using a similar mark).

   **2.    Even if It Has Acquired Secondary Meaning, Trademark Rights in Unregistered Marks Like "Philbrick's Sports" are Geographically Limited**

While an owner of an unregistered trademark may possess "common law" trademark rights acquired through use of the mark, such rights are typically geographically limited. Protection of an unregistered mark under the Lanham Act is limited to the owner's trade area at

---

[5] Among the factors courts generally look to in determining whether a term has acquired secondary meaning are (1) the length or exclusivity of use of a mark; (2) the size or prominence of the plaintiff's enterprise; (3) the existence of substantial advertising by plaintiff; (4) the product's established place in the market; and (5) proof of intentional copying.  *Bay State*, 484 F.Supp.2d at 214 (citing *I.P. Lund Trading v. Kohler Co.*, 163 F.3d 27, 42 (1st Cir. 1998)).

the alleged infringer's moment of first use.[6]  *Gen. Healthcare Ltd. v. Qashat*, 364 F.3d 332, 336 n. 7 (1st Cir. 2004) (noting that, while "[federal] registration is not required, [the extent] of any common law rights vindicated would be limited to areas where the mark is in use"); *Game Power Headquarters, Inc. v. Owens*, Civ. A. No. 94-5821, 1995 WL 273663 at *5 (E.D. Pa. May 4, 1995) (same).  An owner of a common law mark may not obtain relief against another user of the mark in an area where the owner has no established trade, and hence no reputation and goodwill.  *Citizens Fin. Group, Inc. v. Citizens Nat'l Bank of Evans City*, 383 F.3d 110, 132 (3rd Cir. 2004); *see also MNI Mgmt., Inc. v. Wine King, LLC*, 542 F. Supp. 2d 389, 406 (D.N.J. 2008) ("A party asserting [common law] trademark ownership must show 'clear entitlement' to protection of a trademark in a particular market.") (citation omitted).

### 3. "Philbrick's Sports" Was Not Distinctive in Washington State, if At All, in November 2005

Philbrick cannot demonstrate that "Philbrick's Sports" was distinctive in Washington State, where eNom is located, in November 2005.  Regardless of whether this Court chooses to analyze the distinctiveness of "Philbrick's Sports" under the traditional secondary meaning analysis or the geographic trade area analysis for unregistered "common law" marks, the conclusion is the same—"Philbrick's Sports" was not distinctive outside of New England, if at all, in November 2005.

First, with regard to the volume of sales under the "Philbrick's Sports" mark, or the "size and prominence" of Philbrick's business, the evidence clearly shows that, until Philbrick sold the <hockey.com> domain name in October 2005, **all** of Philbrick's Internet sales were made under

---

[6] Courts consider a number of factors to define a common law trademark owner's area of trade, including (1) the volume of sales of the trademarked goods; (2) the growth trends (both positive and negative) in the area; (3) the number of persons actually purchasing the product in relation to the potential number of customers; and (4) the amount of product advertising in the area.  *Id.*  The sporadic and casual use of marketing over the Internet is insufficient to create common law trademark rights outside of the owner's trade area.  *Big Time Worldwide Concert & Sport Club at Town Center LLC v. Marriott Int'l, Inc.*, 236 F. Supp. 2d 791, 798 (E.D. Mich. 2003).

the trade name "Hockey.com", through Philbrick's <hockey.com> website. *See* Ex. 10, M. Langley, pp. 61:5-72:14. Until October 2005, Philbrick had only used the name "Philbrick's Sports" in association with the sale of goods at its retail stores in New Hampshire. *See* Ex. 10, M. Langley, pp. 77:7-77:21 ("Philbrick's Sports," "Philbrick's Sports Center," or "Dover Sports" did not appear on the homepage for <hockey.com>), 83:7-84:2 (receipts for online purchases on <hockey.com> did not include "Philbrick's Sports," "Philbrick's Sports Center," or "Dover Sports"); Ex. 7, 30(b)(6) Dover Sports, 42:7-43:10 ("Philbrick's Sports," "Philbrick's Sports Center," or "Dover Sports" did not appear on the homepage for <hockey.com>). Thus, the volume of sales by Philbrick under the "Philbrick's Sports" name outside of New England, at least through October 2005, was zero.[7]

Moreover, the growth trends of Philbrick's sales under the "Philbrick's Sports" mark outside of New England, were likewise zero until October 2005, as such sales did not exist. Similarly, the number of persons outside of New England who actually purchased products sold by Philbrick under the name "Philbrick's Sports" (as opposed to "Hockey.com"), is zero. Indeed, Philbrick has refused to identify the total number of customers from each of the 50 states who purchased goods from Philbrick under any name, much less under the name "Philbrick's Sports." *See* Ex. 15, Pl. Resp. to Int. No. 16.

With respect to the amount of Philbrick's advertising of the "Philbrick's Sports" name outside of New England prior to November 2005, once again that amount is zero. Philbrick has not identified any advertisements for its "Philbrick's Sports" business, at any point in time, which were published or disseminated outside of New England. *See* Ex. 9, Pl. Resp. to Int. No.

---

[7] Moreover, to the extent that Philbrick sold any goods through its <philbricks.net> website between the time it stopped using the <hockey.com> domain name in October 2005, and November 23, 2005, Philbrick has failed to produce any evidence to quantify any such sales.

13; Ex. 7, 30(b)(6) Dover Sports, pp. 217:8-230:19.  Moreover, while Philbrick claims that it has advertised in newspapers and on radio stations that are available over the Internet, Philbrick has offered no evidence that any such advertisements were actually seen or heard by anyone located outside of New England.

Hence, there is no genuine issue of material fact that whatever trademark rights Philbrick may have had in November 2005 with respect to the descriptive name "Philbrick's Sports", those rights were limited in scope to New England, where Philbrick had advertised and sold goods under the "Philbrick's Sports" name.  Accordingly, this Court should find that, as a matter of law, the "Philbrick's Sports" name was not distinctive in Washington State in November 2005.

### 4.     "Philbrick's Sports" Was Not Famous in November 2005

There is no question that "Philbrick's Sports" was not famous in November 2005.  A famous mark is one that is "widely recognized by the general consuming public of the United States as a designation of source of the goods or services of the mark's owner."  15 U.S.C. § 1125(c)(2)(A).  Indeed, the First Circuit has stated that "courts should be discriminating and selective in categorizing a mark as famous" and noted the "rigorous standard of fame."  *I.P. Lund*, 163 F.3d at 46-47.

Simply put, in order to be famous a mark must be a household name.  MCCARTHY, § 24:104 (citing *Thane Intern., Inc. v. Trek Bicycle Corp.*, 305 F.3d 894, 910 (9th Cir. 2002)).  *See also I.P. Lund*, 163 F.3d at 47 (noting that "national renown is an important factor in determining whether a mark qualifies as famous").  The mere acquisition of secondary meaning in a descriptive designation is nowhere near sufficient to achieve the status of a famous mark.  *I.P. Lund*, 163 F.3d at 47 (citing MCCARTHY, § 24:91).  Moreover, a trademark cannot be famous without being distinctive.  *Id.*

Here, Philbrick cannot possibly demonstrate that "Philbrick's Sports" was famous in November 2005. At the outset, as noted above, if "Philbrick's Sports" was at all distinctive at that time, it certainly was not distinctive outside of New England. Moreover, Philbrick has offered no evidence that "Philbrick's Sports" is "widely recognized by the general consuming public of the United States" or a "household name." Accordingly, this Court should find as a matter of law that "Philbrick's Sports" was not famous in November 2005.

### D. Because Philbrick Has Elected to Seek Statutory Damages Under the ACPA, Philbrick is not Entitled to a Recovery of Attorneys Fees

The remedies section of the Lanham Act, 15 U.S.C. § 1117(a), allows ACPA plaintiffs "to recover . . . (1) defendant's profits, (2) any damages sustained by plaintiff, and (3) the costs of the action." 15 U.S.C. § 1117(a). ACPA plaintiffs may also elect "to recover, instead of actual damages and profits, an award of statutory damages." 15 U.S.C. § 1117(d). While 15 U.S.C. § 1117(a) allows courts to "award reasonable attorney fees to the prevailing party" in exceptional cases, neither § 1117(c) nor 1117(d)—the two sections of the Lanham Act remedies statute granting plaintiffs the right to "elect" statutory damages in lieu of actual damages—make any provision for granting attorney's fees.

Thus, a plaintiff who elects to pursue statutory damages under the Lanham Act rather than actual damages is precluded from obtaining an award of attorney's fees. *K&N Eng'g, Inc. v. Bulat*, 510 F.3d 1079, 1081 (9th Cir. 2007). In interpreting the remedies provisions of the Lanham Act, the *K&N Eng'g* court noted that § 1117 established an integrated scheme to recover damages and attorney's fees. *Id*. After interpreting the first three subsections of § 1117, the Ninth Circuit concluded that § 1117(c) "makes no provision for attorney's fees; nor does § 1117(b) authorize such fees for a plaintiff seeking statutory damages under § 1117(c)." *Id*. at

1082. Rather, the language of § 1117(b) expressly limits its grant of attorney's fees to situations where courts are "assessing damages under subsection (a)." *Id*.

Notably, § 1117(d) - like § 1117(c) - does not provide for any recovery of attorney's fees. As a result, there is no statutory basis for an ACPA plaintiff who elects to pursue statutory damages under § 1117(d) to also recover attorney's fees. There is no dispute that Philbrick is seeking only statutory damages under § 1117(d), and is not seeking any award of damages under § 1117(a). *See* Ex. 16, Pl. Res. to Int. No. 12. Because the statutory damages provision of 15 U.S.C. § 1117(d) does not provide for an award of attorney's fees, this Court should find that, as a matter of law, Philbrick is precluded from any recovery of attorney's fees under the ACPA.

## V.     ENOM IS ENTITLED TO SUMMARY JUDGMENT ON PHILBRICK'S CLAIM UNDER 15 U.S.C. § 1129 (COUNT II) BECAUSE THE DISPUTED DOMAINS DO NOT CONSIST OF THE NAME OF ANOTHER LIVING PERSON

Because the Disputed Domains do not consist of the name of another living person, eNom cannot be liable to Philbrick under 15 U.S.C. § 1129. Under that statute, "[a]ny person who registers a domain name that consists of the name of another living person, or a name substantially and confusingly similar thereto, without that person's consent, with the specific intent to profit from such name by selling the domain name for financial gain to that person or any third party, shall be liable in a civil action by such person." 15 U.S.C. § 1129(1)(A). Every federal court that has found liablity under § 1129(1)(A) has done so when the domain at issue is *identical* to the plaintiff's name.[8]

The only "living person" party plaintiff is Daniel J. Philbrick. There is no genuine factual dispute as to whether "www.philbricksports.com" or "philbricksports" "consists of"

---

[8] *See, e.g., Schmidheiny v. Weber*, 285 F. Supp. 2d 613, 627-628 (E.D. Pa. 2003) (ordering transfer of <schmidheiny.com> where the plaintiff was ranked three consecutive times in Forbes Magazine among the wealthiest individuals in the world and his surname was quite rare); *Salle v. Meadows*, No. 6:07-cv-1089-Orl-31DAB, 2007 WL 4463920 (M.D. Fla. 2007) (ordering transfer of <briansalle.com>); *Wright v. Domain Source, Inc.*, No. 02 C 2525, 2002 WL 1998287 (N.D. Ill. 2002) (ordering transfer of <paulwright.com>).

15

"Daniel Philbrick"—they do not.  No reasonable trier of fact could find otherwise.  Since there is

no precedent for finding liability under § 1129 when the domain is anything but *identical* to the

plaintiff's *full* name (or his surname, but only when that name is both well-known and rare),

there is no genuine factual dispute as to whether "www.philbricksports.com" or

"philbricksports" are substantially and confusingly similar to "Daniel Philbrick."  As a matter of

law, they are not.  Accordingly, eNom is entitled to summary judgment on Philbrick's claim

under 15 U.S.C. § 1129.

## VI.    EVEN IF ENOM WERE NOT IMMUNE FROM LIABILITY AS A REGISTRAR, ENOM WOULD BE ENTITLED TO SUMMARY JUDGMENT ON PHILBRICK'S LANHAM ACT CLAIMS

### A.    Philbrick Cannot Prevail on its Lanham Act Claims Because There Was No Likelihood of Confusion Between Philbrick and eNom

In order to prevail on its claims under the Lanham Act, Philbrick must prove not merely a

theoretical possibility of confusion, but rather a "likelihood of confounding an appreciable

number of reasonably prudent purchasers exercising ordinary care."  *Int'l Assoc. of Machinists

and Aerospace Workers, AFL-CIO v. Winship Green Nursing Center*, 103 F.3d 196, 200-01 (1st

Cir. 1996).   Because Philbrick cannot adduce "significantly probative" evidence that an

appreciable number of consumers in Philbrick's New England trade area were likely to be

confused or misled by eNom's alleged use of "Philbrick's Sports," *id.*, this Court should grant

summary judgment in favor of eNom on Philbrick's Lanham Act claims.

### 1.    The Standard for Determining a Violation of the Lanham Act is Likelihood of Confusion

The standard for determining a violation of the Lanham Act, regardless of whether the

alleged violation is based on trademark infringement, misleading designation of origin, or false

advertising, is likelihood of confusion.[9] *Eckel Indus., Inc. v. Primary Bank*, 26 F. Supp. 2d 313, 316 (D.N.H. 1998) (citing MCCARTHY, § 27.03 (3rd ed. 1996)).  To demonstrate a likelihood of confusion, a trademark holder must show more than the theoretical possibility of confusion. *Winship Green*, 103 F.3d at 200; *see also Lockheed Martin Corp. v. Network Solutions, Inc*., 985 F.Supp. 949, 956 (C.D. Cal. 1997), *aff'd* 194 F.3d 980 (9th Cir. 1999) ("To be liable under section 32, a person must use the mark on competing or related goods in a way that creates a likelihood of confusion.").

### 2.    Philbrick Cannot Meet Its Burden of Showing That an Appreciable Number of Consumers Were Likely to be Confused

Analyzing the factors considered in determining likelihood of confusion demonstrates that there is no triable issue; Philbrick cannot establish likelihood of confusion.  First, Philbrick is unable to produce adequate evidence regarding "the crucial categories of similarity of the products and actual confusion." *Hasbro, Inc. v. Clue Computing, Inc.*, 66 F. Supp. 2d 117, 126 (D. Mass. 1999).  Moreover, Philbrick has offered no admissible evidence of actual confusion regarding the origin or affiliation of any website associated with the Disputed Domains.[10]

In addition, the parties' products or services are not similar.  eNom does not sell hockey equipment, sporting equipment, or, for that matter, any other products.  (Ex. 1, Ursini Decl., ¶10).  Indeed, eNom did not make any trademark use of the Disputed Domains, and is entitled to summary judgment based on this fact alone.  *See, e.g., Lockheed*, 985 F. Supp. at 956-58 (finding

---

[9] Courts in the First Circuit typically consider eight factors in assessing likelihood of confusion: (1) the similarity of the marks; (2) the similarity of the goods or services; (3) the relationship between the parties' channels of trade; (4) the juxtaposition of their advertising; (5) the classes of prospective purchasers; (6) the evidence of actual confusion; (7) the defendant's intent in adopting its allegedly infringing mark; and (8) the strength of the plaintiff's mark. *Winship Green*, 103 F.3d at 201.  Those factors are meant to be used as guides, and are not intended to be either all-encompassing or exclusive.  *Id.*

[10] While Philbrick asserted in its response to eNom's Interrogatory No. 20 that, on a single occasion, someone had told Mr. Philbrick that she was unable to find Philbrick's website, such hearsay evidence, even if admissible, does not demonstrate actual confusion.  *See Hasbro*, 66 F. Supp. 2d at 124 ("The fact that one, two or three people over four years may have expressed confusion . . . does not constitute the level of actual confusion necessary to support a general finding of likelihood of confusion.").  Moreover, Mr. Philbrick admitted that he did not even know whether the website that person had accessed was operated by eNom.  *See* Ex. 7, 30(b)(6) Dover Sports, 252:3-253:15.

17

domain name registrar's acceptance of registrations for domain names resembling is not a use of the mark in connection with goods or services).  The mere fact that eNom hosted a website on the Internet certainly does not mean that this factor weighs in favor of a finding of similarity. *See Therma-Scan, Inc. v. Thermoscan, Inc.*, 118 F. Supp. 2d 792, 802-803 (E.D. Mich. 2000) ("the fact that both parties [market through the Internet] does not militate in favor of finding a likelihood of confusion; [rather, the] failure of either party to utilize the Internet for [marketing] would seem remarkable, given the increasing number of consumers who utilize the Web as an information and research tool), *aff'd.*, 295 F.3d 623 (6th Cir. 2002); *Northland Ins. Co. v. Blaylock*, 115 F. Supp. 2d 1108, 1119-1121 (D. Minn. 2000) (rejecting plaintiff's assertion that there existed a likelihood of confusion merely because "both [parties] are on the Internet and both are vying for the attention of Internet users").

While content was available on the website associated with the <philbricksports.com> domain name, it consisted of advertising content generated by Yahoo!  An Internet user encountering that site would not have been able to purchase any products through that site.  (Exh. 1, Ursini Decl., ¶10).  Rather, someone clicking on an advertising link on that website would ultimately be redirected to a third party's website, which would clearly indicate to the Internet user that the website was not operated by or affiliated with Philbrick.  (Exh. 1, Ursini Decl., ¶10). As another district court has noted, "Internet surfers are inured to the false starts and excursions awaiting them in this evolving medium" and are "unlikely to be dissuaded, or unnerved" when, after "tak[ing] a stab at what they think is the most likely domain name for a particular web site" guess wrong and bring up another's webpage. *Strick Corp. v. Strickland*, 162 F. Supp. 2d 372, 377 (E.D. Pa. 2001) (citations omitted).

18

The other likelihood of confusion factors likewise fail to enable a finding that an appreciable number of consumers were in fact likely to be confused or misled in this case. With regard to the strength of the mark, it is undisputed that "Philbrick's Sports" is descriptive, and therefore weak, and any secondary meaning which may exist in that mark extends no further than New England. Moreover, while the Disputed Domains may be similar in appearance to "Philbrick's Sports", the similarity of marks is not decisive if other factors indicate a lack of confusion. *Hasbro*, 66 F. Supp. 2d at 122. Further, there is no evidence that eNom had any intent to create confusion between eNom and Philbrick, which had no trademark rights in Washington State and was not known to eNom. *See id.* at 125 (noting plaintiff had produced no evidence that the defendant intended to create confusion).

### B.    Philbrick Cannot Establish Two Necessary Elements of a False Advertising Claim Under 15 U.S.C. § 1125(a) (Count IV)

eNom is entitled to summary judgment on Philbrick's claim for false advertising under 15 U.S.C. § 1125(a), because Philbrick is unable to identify any evidence which would support two of the required elements of that claim.[11] Because Philbrick has failed to identify any "false or misleading representation of fact" made by eNom about eNom's or Philbrick's products or services, Philbrick is unable to prevail on the first prong of the false advertising analysis. Indeed, in its response to an interrogatory requesting that it identify the complete factual basis for its false advertising claim, Philbrick failed to identify any false or misleading representation of **fact** by eNom regarding any products or services. *See* Ex. 17, Pl. Resp. to Int. No. 3.

---

[11] The elements of a false advertising claim under the Lanham Act are: (1) the defendant made a false or misleading representation of fact in a commercial advertisement about his own or another's product or service; (2) the misrepresentation is material; (3) the misrepresentation deceives, or has the tendency to deceive, a substantial segment of its audience; (4) the defendant placed the misrepresentation in interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result of the misrepresentation, either by direct diversion of sales or by a lessening of goodwill associated with its products or service. *Doe v. Friendfinder Network, Inc.*, 540 F. Supp. 2d 288, 305 (D.N.H. 2008) (citing *Cashmere & Camel Hair Mfrs. Inst. v. Saks Fifth Ave.*, 284 F.3d 302, 310-11 (1st Cir. 2002).

Additionally, Philbrick has offered no evidence that it "has been or is likely to be injured as a result" of any misrepresentation.  In its response to eNom's Interrogatory No. 3, Philbrick failed to identify any facts which would establish that it had been or was likely to be injured by any purported "representations" made by eNom.  *See* Ex. 17, Pl. Resp. to Int. No. 3; Ex. 10, M. Langley, pp. 154:4-155:10 (admitting that Plaintiffs have no knowledge of anyone purchasing a product through a link on any of the Disputed Domain Names); Ex. 14, K. Ruel, pp. 41:10-41:13 (same); Ex. 7, 30(b)(6) Dover Sports, pp. 279:16-281:7 (same).  Moreover, Dover Sports' Rule 30(b)(6) witness, Mr. Philbrick, was unable to identify any customers or sales lost by Philbrick as a result of eNom's alleged activities.  *See* Ex. 7, 30(b)(6) Dover Sports, pp. 250:22-257:17; *see also* Ex. 16, Pl. Resp. to Int. No. 12.

Indeed, Plaintiffs could not identify even a single customer who encountered an eNom website believing that it was somehow affiliated with Philbrick Sports Center or Dover Sports, much less any customer who ever purchased any sporting goods product through a third-party website accessed through any website associated with one of the Disputed Domains.  *See* Ex. 17, Pl. Resp. to Int. No. 3; Ex. 10, M. Langley, pp. 154:4-155:10; Ex. 14, K. Ruel, pp. 41:10-41:13; Ex. 7, 30(b)(6) Dover Sports, pp. 250:22-257:17, 278:3-282:22; *see also* Ex. 16, Pl. Resp. to Int. No. 12.  Nor could Plaintiffs identify any evidence of lost goodwill resulting from any website operated by eNom.  *See* Ex. 17, Pl. Resp. to Int. No. 3; Ex. 10, M. Langley, pp. 154:4-155:10; Ex. 14, K. Ruel, pp. 41:10-41:13; Ex. 7, 30(b)(6) Dover Sports, pp. 250:22-257:17, 278:3-282:22; *see also* Ex. 16, Pl. Resp. to Int. No. 12.

### C.    Philbrick is Not Entitled to Damages Under its Lanham Act Claims Because Philbrick Has Offered No Evidence of Actual Harm

Because Philbrick has offered no evidence whatsoever that it has suffered any actual harm to its business as a result of the alleged use of "Philbrick's Sports" by eNom, Philbrick

cannot recover damages for any alleged violations of 15 U.S.C. § 1125(a).  In order to recover damages for a § 1125(a) violation, the aggrieved party must show that it suffered actual harm to its business.  *Quabaug Rubber Co. v. Fabiano Shoe Co., Inc.*, 567 F.2d 154, 161-62 (1st Cir. 1977); *Eckel Indus.*, 26 F. Supp. 2d at 317.

Here, the record is devoid of any evidence that Philbrick has suffered any harm to its business as a result of the purported use of "Philbrick's Sports" by eNom.  Indeed, when asked to identify any lost sales or other harm suffered as a result of eNom's alleged conduct, Philbrick has consistently been unable to do so.  *See* Ex. 17, Pl. Resp. to Int. No. 3; Ex. 10, M. Langley, pp. 154:4-155:10; Ex. 14, K. Ruel, pp. 41:10-41:13; Ex. 7, 30(b)(6) Dover Sports, pp. 250:22-257:17, 278:3-282:22; *see also* Ex. 16, Pl. Resp. to Int. No. 12.  Accordingly, eNom is entitled to summary judgment that Philbrick cannot recover any damages under the Lanham Act.

## VII.  ENOM IS ENTITLED TO SUMMARY JUDGMENT ON PHILBRICK'S STATE AND COMMON LAW CLAIMS

Because Philbrick's New Hampshire state and common law trademark infringement and unfair competition claims (Counts V, VI and VII) are governed by the same standards as its Lanham Act claims (Counts III and IV), eNom is likewise entitled to summary judgment on those claims.  *See Attrezzi, LLC v. Maytag Corp.*, 436 F.3d 32, 42 (1st Cir. 2006) ("[T]he Lanham Act primarily provides a federal forum for what is in substance a traditional common-law claim.").  Accordingly, this Court must apply the same likelihood of confusion standard to those claims, as a result of which eNom is also entitled to summary judgment.  *See* MCCARTHY, § 23:1.50 (noting that since both federal and state law depend upon likelihood of confusion, "it is appropriate to rely upon federal precedent [to determine infringement] under state statutory or common law"); *see also Beacon Mut. Ins. Co. v. OneBeacon Ins. Group*, 376 F.3d 8, 14 (1st Cir. 2004) (stating "the same likelihood of confusion requirement applies to [plaintiff's] claims under

21

Rhode Island common law for unfair competition and service mark infringement").

Further, because eNom is entitled to summary judgment on Counts III-VII, eNom is also entitled to summary judgment on Count VIII for unjust enrichment.  Since unjust enrichment "aims to strip the defendant of its ill-gotten gains," there can be no unjust enrichment where there are no "ill-gotten gains" achieved through trademark infringement or unfair competition. *Data Gen. Corp. v. Grumman Sys. Support Corp.*, 36 F.3d 1147, 1177 (1st Cir. 1994).

## VIII.  ENOM IS ENTITLED TO SUMMARY JUDGMENT ON PHILBRICK'S FALSE LIGHT INVASION OF PRIVACY CLAIM

### A.    New Hampshire Has Never Recognized a Cause of Action for False Light Invasion of Privacy

eNom is entitled to summary judgment on Mr. Philbrick's false light invasion of privacy claim (Count IX) because such a cause of action has never been recognized by any New Hampshire court.  Indeed, when the New Hampshire Supreme Court most recently addressed this issue, it declined to recognize such a claim, noting that "[w]e have not yet addressed whether the tort of invasion of privacy-false light is recognized in New Hampshire, and we need not do so at this time."  *Thomas v. Tel. Publ'g Co.*, 859 A.2d 1166, 1170 (N.H. 2004) (citation omitted).

Moreover, the First Circuit has likewise recognized that "a number of jurisdictions have declined to recognize a common law cause of action for false light invasion of privacy" and that "[t]he New Hampshire Supreme Court has never explicitly recognized the viability of a claim for false light."  *Howard v. Antilla*, 294 F.3d 244, 248 (1st Cir. 2002).  Indeed, the *Howard* court considered the merits of the plaintiff's false light invasion of privacy claim only because the parties had agreed that "a common law claim for false light invasion of privacy could be sustained under the law of New Hampshire," and the district court followed the parties' agreement.  *Id.*  Accordingly, because Mr. Philbrick's false light invasion of privacy claim is not recognized under New Hampshire law, eNom is entitled to summary judgment on that claim.

22

**B.    eNom Did Not Publicize Any False Matter About Mr. Philbrick**

Even if New Hampshire did recognize a claim for false light invasion of privacy (which eNom contends it does not), eNom is entitled to summary judgment on that claim because it has not publicized any false matter regarding Mr. Philbrick.  Traditionally, a claim for invasion of privacy by false light requires a showing that the defendant gave "publicity to a matter concerning another," and that:

> (a) the false light in which the other was placed would be highly offensive to a reasonable person, and (b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed.

*Howard*, 294 F.3d at 248 (quoting Restatement (Second) of Torts, § 652E).

Further, when the "action involves a public figure plaintiff and a media defendant," a plaintiff cannot recover unless he proves by clear and convincing evidence that the defendant was motivated by "actual malice - that is, that the defendant acted intentionally or with reckless disregard" to place the plaintiff in a false light.  *See id.* at 248-52 (applying *New York Times v. Sullivan* and its progeny).  Mr. Philbrick is admittedly "an active and well-known member of the local Republican party, having run for office and having been actively involved in political fundraising and other activities."  (Dkt. No. 26, p. 1; Ex. 18).  As such, Mr. Philbrick qualifies as a public figure for purposes of his false light claim, and must prove actual malice.

There is no dispute that eNom never publicized any information about Mr. Philbrick himself.  It merely operated a website featuring advertising associated with a domain name to which Philbrick claims trademark rights.  Further, even if operating a website featuring advertising could be considered a "statement," there is no evidence that any statement relating to Mr. Philbrick himself, much less a false statement, ever appeared on any such website.

CHI 57,548,217v1 10-17-08

Indeed, Philbrick's ACPA and trademark claims in this litigation are based upon the premise that consumers would have associated those websites with Dover Sports, which does business as "Philbrick's Sports", not with Mr. Philbrick himself. However, corporations do not enjoy the same right of privacy as individuals. *Intercity Maintenance Co. v. Local 254 Service Employees Intern. Union*, 62 F. Supp. 2d 483, 506 (D.R.I. 1999), aff'd in part, vacated in part on other grounds, remanded, 241 F.3d 82 (1st Cir. 2001). Accordingly, any claim that alleged statements which could be interpreted as relating to Dover Sports, rather than Mr. Philbrick, somehow give rise to a claim for false light invasion of privacy fails as a matter of law.

Moreover, it would be impossible for Mr. Philbrick to prove that anything that ever appeared on any website associated with either of the Disputed Domains was placed there by eNom with actual malice, since eNom did not even generate the content that appeared on these websites (Ex. 1, Ursini Decl., ¶9), and therefore could not have acted intentionally with respect to Mr. Philbrick. Allowing the listing of advertising links on a website by a third party does not fulfill the requirement of publicly placing Mr. Philbrick in a false light, with actual malice.

C.    **eNom is Immune From Liability for False Light Invasion of Privacy Under Section 230 of the Communications Decency Act**

Mr. Philbrick's false light invasion of privacy claim against eNom is likewise preempted by the Good Samaritan Exemption of the Telecommunications Act of 1996, otherwise known as the Communications Decency Act ("CDA"), 47 U.S.C. § 230(c). The CDA insulates providers of interactive computer services[12] such as eNom from exactly the kind of vicarious liability at issue with this claim. The statute provides that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another

---

[12] An "interactive computer service" is defined as "any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server, including specifically a service or system that provides access to the Internet and such systems operated or services offered by libraries or educational institutions." 47 U.S.C. § 230(f)(2).

information content provider" and expressly preempts any law to the contrary.  *Id.* §§ 230(c)(1), 230(e)(3).  Mr. Philbrick's claim for false light invasion of privacy is based on eNom's act of registering a domain name at the behest of a third party, RareNames.  eNom is being sued in its capacity as a publisher or speaker of content on the  website at philbricksports.com, to the extent that eNom hosted such a site.  Website operators and registrars are providers of interactive computer services within the meaning of Section 230.  *Universal Communication Systems, Inc. v. Lycos, Inc.*, 478 F.3d 413, 419 (1st Cir. 2007); *see also Smith v. Intercosmos Media Group, Inc.*, 2002 WL 31844907, at *4 (E.D. La. 2002) (holding a domain name registrar immune from liability under the CDA).

This Court has found that the CDA should be broadly construed to preempt a wide array of claims against interactive computer services such as eNom, including the very claim alleged by Plaintiff in this case – a violation of the right of privacy.  *See Doe v. Friendfinder Network, Inc.*, 540 F. Supp. 2d 288, 303 (D.N.H. 2008) (dismissing invasion of privacy claim against service provider and stating that Section 230's immunity "applies with full force to . . .  invasion of privacy claims.").  Other courts agree.  *See, e.g., Carafano v. Metrosplash.com*, 339 F.3d 1119, 1122-25 (9th Cir. 2003) (holding that interactive computer service was entitled to statutory immunity from liability in tort, including for alleged invasion of privacy); *Parker v. Google, Inc.*,  422 F. Supp. 2d 492, 500 (E.D. Pa. 2006) (same).  Accordingly, eNom is likewise entitled to summary judgment under the CDA on Mr. Philbrick's false light invasion of privacy claim.

## IX.    CONCLUSION

For the reasons set forth hereinabove, eNom respectfully requests that this Court grant summary judgment to eNom on the counts addressed hereinabove.

Respectfully Submitted,

ENOM, INC.

Dated:  October 17, 2008

/s/ Jeffrey P. Dunning
Paul D. McGrady, Jr. (*Pro Hac Vice*)
Jeffrey P. Dunning (*Pro Hac Vice*)
Jason B. Elster (*Pro Hac Vice*)
GREENBERG TRAURIG, LLP
77 West Wacker Drive, Suite 2400
Chicago, IL 60601
Telephone:  (312) 456-8400

-and-

Steven M. Gordon
SHAHEEN & GORDON, P.A.
107 Storrs Street
Concord, NH 03302
Telephone: (603) 225-7262

26

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this ENOM, INC.'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT was served on the following persons on October 17, 2008 in the manner specified herein:

Electronically served through ECF:

> Kevin M. Fitzgerald, Esq.
> kfitzgerald@nixonpeabody.com
>
> Courtney Brooks, Esq.
> cbrooks@nixonpeabody.com
>
> Jeffrey Dunning, Esq.
> DunningJ@gtlaw.com
>
> Paul McGrady, Jr., Esq.
> McGradyP@gtlaw.com
>
> Jason Elster, Esq.
> ElsterJ@gtlaw.com
>
> Steven Gordon, Esq.
> sgordon@shaheengordon.com

/s/ Jeffrey P. Dunning
Jeffery P. Dunning