UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

Daniel J. Philbrick and
Dover Sports, Inc.

     v.                            Civil No. 07-215-JL
                                       Opinion No. 2009 DNH 010

eNom, Inc.

## O R D E R

In this intellectual property lawsuit, defendant eNom, Inc.,
a provider of domain name registration services based in
Bellevue, Washington, moves for summary judgment on claims
arising out of eNom's handling of domain names confusingly
similar to the plaintiffs' trade name, "Philbrick's Sports."  The
plaintiffs allege that eNom's handling of the domain names, which
include "philbricksports.com," "philbricksports.net," and
"philbrickssports.net," violated the Anti-Cybersquatting Consumer
Protection Act ("ACPA"), Pub. L. No. 106-113, app. I, sec. 3001,
113 Stat. 1501A-545 (1999) (codified in scattered sections of 15
U.S.C.), and amounted to false designation and advertising in
violation of the Lanham Act, 15 U.S.C. §§ 1051 et seq., as well
as infringement of the plaintiffs' rights under New Hampshire
statutory and common law.  The plaintiffs move for summary
judgment in their favor on their cybersquatting claim under

§ 3002(a) of the ACPA, 15 U.S.C. § 1125(d).  Each party also
moves to strike certain evidentiary materials submitted in
connection with the summary judgment motions.

This court has jurisdiction over this matter under 28 U.S.C.
§§ 1121 (Lanham Act), 1332 (diversity), and 1367 (supplemental
jurisdiction).  After hearing oral argument, and for the
foregoing reasons, the court grants eNom's motion for summary
judgment and denies the plaintiffs' motion for summary judgment.

## I.  <u>Applicable legal standard</u>

Summary judgment is appropriate where the "pleadings, the
discovery and disclosure materials on file, and any affidavits
show that there is no genuine issue as to any material fact and
that the movant is entitled to a judgment as a matter of law."
Fed. R. Civ. P. 56(c).  In making this determination, the "court
must scrutinize the record in the light most flattering to the
party opposing the motion, indulging all reasonable inferences in
that party's favor."  <u>Mulvihill v. Top-Flite Golf Co.</u>, 335 F.3d
15, 19 (1st Cir. 2003).  On cross-motions for summary judgment,
"the court must consider each motion separately, drawing
inferences against each movant in turn."  <u>Merchants Ins. Co. of
N.H., Inc. v. U.S. Fid. & Guar. Co.</u>, 143 F.3d 5, 7 (1st Cir.

1998) (quotation marks omitted).  The following facts are set forth in the light most favorable to the plaintiffs.

## II.  __Background__

Plaintiff Daniel J. Philbrick owns plaintiff Dover Sports, Inc., a sporting goods retailer based in Dover, New Hampshire, in the Seacoast region of the state.  Since 1983, Philbrick has done business at that location under the name "Philbrick's Sports," which was registered as a trade name with the New Hampshire Secretary of State in 1992.  It was Philbrick's father who first started using the family name in business, when, in 1965, he opened "Philbrick's Sales and Service," a bicycle and lawnmower shop, in Rye, also in the Seacoast region of New Hampshire.  In 1976, Philbrick's twin brother, Rick, took over the bicycle business from his father, opening "Philbrick's Sports World" in a building across the street from "Philbrick's Sales and Service."

"Philbrick's Sales and Service" has remained in operation ever since, dealing in lawnmowers and similar yard and garden equipment.  "Philbrick's Sports World" closed in 1988 or so, but after a period of time Rick Philbrick was back in business as "Philbrick's Seacoast Sports," which operated until approximately

1997.[1]  Since Daniel Philbrick started "Philbrick's Sports" in
1983, then, at least one other business in the same area has been
using the name "Philbrick's," at times in conjunction with
"Sports."  Though each of the Philbrick brothers had his father's
permission to use the name in business, and Rick Philbrick had
his brother's permission to use the name "Philbrick's Seacoast
Sports," none of the three Philbricks' businesses was otherwise
affiliated with the others'.[2]  Daniel Philbrick recalled that
there was "lots of confusion" among consumers as to "Philbrick's
Sports" and "Philbrick's Seacoast Sports," with customers who had
purchased a product from the latter looking to the former for
repairs or servicing.

    Since 1983, the plaintiffs have regularly advertised
"Philbrick's Sports" through a number of media:  newspapers,
magazines, catalogs, telephone directories, signage at hockey
arenas, radio, and television.  This advertising ran exclusively
in media outlets in the New Hampshire or greater Boston area,
such as New Hampshire- and Boston-based newspapers and radio
stations.  Between 2000 and 2008, the plaintiffs spent more than

---

[1]It appears that Rick Philbrick took over "Philbrick's Sales
and Service" from his father at that point.

[2]Daniel and Rick Philbrick did, however, occasionally market
their businesses together through "co-branded" advertisements.

4

$1.5 million on advertising "Philbrick's Sports," including more than $1 million on radio and print ads.  The plaintiffs have also engaged in on-line Internet advertising.

The plaintiffs registered the domain names "philbricks.net," "philbricks.com" and "philbrickssports.com" in the late 1990s, but until 2001 or so, those sites contained only general information about the "Philbrick's Sports" retail store, such as its location and history, without providing any way for consumers to buy anything.  The "philbricks.com" and "philbrickssports.com" domain names, in fact, did not have any independent content, serving simply to redirect visitors to the "philbricks.net" site.

Beginning in early 2001, however, a customer visiting the "philbricks.net" domain could click on a "store" button, redirecting him to "newenglandhockey.com" or, later, "hockey.com," websites through which hockey equipment could be purchased.  But these websites, which could also be accessed independently, did not identify their affiliation with "Philbrick's Sports," unless the user clicked an "about" button to access another page of information about the history of that business.[3]  When a customer purchased an item through the

---

[3]The plaintiffs have submitted what Philbrick describes as "portions" of the "hockey.com" website that reference "Philbrick's Sports," which appear to be the content accessed by clicking the "about" button on "hockey.com," but are not further

"newenglandhockey.com" or "hockey.com" website, that name--as
opposed to "Philbrick's Sports"--appeared on the invoice.[4]

The plaintiffs continued these practices until October 2005,
when they sold the "hockey.com" domain name to a third party for
$1 million.  Since then, visitors to the "philbricks.net" site
have been able to buy merchandise by clicking on the appropriate
links, i.e., the "hockey" link to browse for and purchase hockey
equipment, which leads to a subdomain that identifies itself as a
webpage for "Philbrick's Sports."  The plaintiffs have not
identified any evidence in the summary judgment record tallying
the sales they have made through this version of the
"philbricks.net" site, as opposed to the "hockey.com" site.

---

explained.  At oral argument, the plaintiffs represented that
these materials were part of the "hockey.com" homepage, but that
is contrary to the testimony of Dover's Rule 30(b)(6) designate
on that subject.  This witness also testified that, from time to
time, each of the "hockey.com" and "newenglandhockey.com"
homepages had a footer announcing that it was "a division of
either Philbrick's Sports or Dover Sports," but could not
remember which.

[4]The plaintiffs claim to have "co-advertised and co-branded"
the "Philbrick's Sports" and "hockey.com" names during their
ownership of "hockey.com," but the only evidence of those efforts
submitted consists of (1) business cards of an employee, (2) what
appears to be a gift certificate, (3) a cash register receipt
which appears to have been generated at the retail store, and
(4) a print advertisement.  Of these otherwise unexplained
materials, only the last can fairly be characterized as
"branding" or "advertising," but even it is unaccompanied by any
evidence as to where or when it appeared.

Instead, the plaintiffs have submitted a document "showing Philbrick's Sports internet and phone sales during a period between August 2003 and November 2008," which total approximately $1.33 million.  The plaintiffs have also submitted another document showing "Philbricks Sports' sales to Washington state [eNom's principal place of business] during a period between December 2004 and November 2008," representing shipments to some 124 customers with billing or shipping addresses there, but also without disaggregating sales made from the "hockey.com" site.[5]

In January 2007, Philbrick encountered a webpage at the domain name "philbricksports.com"--a web address different from the plaintiffs' own "philbrickssports.com" only in the deletion of one "s."  At the top of the "philbricksports.com" site was a line of text, "philbrick sports sporting good [*sic*] sportswear at philbricksports.com"; beneath that was the phrase "Welcome to Philbricksports.com"; and beneath that was a photograph of a field of poppies.  To the left of the photograph was a column of text reading, "Hockey Equipment," "Hockey," "Honda Generators," "Sporting Good" [*sic*], "Gymnastics Equipment," "Hockey Gear," "Ice Hockey Equipment," "Skis," "Lacrosse Stick," "Soccer Net,"

---

[5]Since the plaintiffs stopped operating the "hockey.com" site in October 2005, separating sales made from there as opposed to the "philbricks.net" site would appear to be a simple matter of restricting the information by date.

"Mini Bike."  Underneath the photograph was an empty rectangle
for entering text as part of a search function.  Further below
was a line of text reading, "Home and Garden," "Utilities,"
"Health and Beauty," "Thrift Stores," "Toys and Hobbies," and
"Pets and Pet Supplies."  Finally, the very bottom of the page
read, "For Sale: Buy This Domain Name[.]  Contact the seller by
clicking here."[6]

Significantly, the plaintiffs have not identified any
evidence in the summary judgment record as to what happened when
a visitor clicked on any of the text on the "philbricksports.com"
site, e.g., "Hockey Equipment," "Skis," "Home and Garden," or the
"For Sale" sign at the bottom of each page.[7]  There is only
eNom's explanation that clicking on one of these links directs
the user to another website operated by a third party, without

---

[6]When this website was accessed in June 2007, its content
was nearly identical, except that the photograph of the poppies
had been replaced with one of a smiling girl with a backpack, and
certain snippets of text had been replaced with other similar
ones, e.g., "Baseball Gloves" rather than "Lacrosse Stick."

[7]Philbrick testified that, by clicking on the "ice skates"
text on one of these sites, a visitor would be "deceptively sent"
to the website of one of his competitors.  But he provided no
foundation for this testimony and the plaintiffs have not
submitted any documentary evidence showing this process in
action.  See Fed. R. Civ. P. 56(e)(1); Fed. R. Evid. 602.
Moreover, the plaintiffs have not relied on this portion of
Philbrick's testimony either in moving for or objecting to
summary judgment, so the court will likewise disregard it.  See
Beltran v. O'Mara, 405 F. Supp. 2d 140, 150 n.13 (D.N.H. 2005).

8

any evidence of who those third parties are, what the websites do, or even what they look like.

When Philbrick used the "philbricksports.com" search function by entering the word "adult" into the rectangle, however, a second page appeared.  This page also announced "Welcome to philbricksports.com," and contained the phrase "ice hockey equipment baseball gloves at philbricksports.com" across the very top.  But, in a format like the results page of an Internet search engine, this page listed a number of what appear to be links to sexually oriented websites, e.g., ""HornyMatches.com," "AdultFriendFinder.com."  Next to this list appeared a column of "Related Links," apparently sorted by content, e.g., sex toys.

The page also contains its own box for conducting a search, a line of text listing more benign topics (e.g., "Vacation," "Gifts," "Personal Finance") and, at the bottom, a link labeled "Why am I seeing this website?"  There is no evidence that anyone other than Philbrick--and, acting at his direction, his employees and counsel--ever discovered this sexually oriented content by using the search function on the "philbricksports.com" site.

The plaintiffs subsequently learned that eNom had acquired the "philbricksports.com" domain name, and a similar domain, "philbricksports.net, on behalf of an unrelated third party,

9

known only as "Rare Names," on November 23, 2005.  ENom describes
itself as a "leading online provider of domain name and other
online services to small and home-based businesses, individuals,
traffic aggregators and resellers," with some 11 million domain
names under registration.  It acquired the "philbricksports.com"
and ".net" names as part of its "Club Drop" program, a service
through which the company receives bids to acquire, on the
bidder's behalf, domain names on "pending delete" status.[8]  A
domain name achieves this status when five days remain until a
domain name registry (an entity responsible for assigning domain
names) makes the name available for registration, which is done
on a first-come, first-serve basis as the prior registration on
the name expires.  Using proprietary technology, eNom attempts to
register a domain name under the "Club Drop" program as soon as
the registry makes it available--a process which, if successful,
results in registration of the name "care of eNom, Inc. on behalf
of eNom, Inc. Customer."  The winning bidder may then complete
registration of the domain name to itself by paying eNom a fee.

If the winning bidder does not pay the registration fee,
however, the name is re-auctioned among the losing bidders; if

---

[8]Though eNom no longer offers the "Club Drop" program as
such, it offers essentially the same services through a program
called "NameJet."

there are none, the name remains in eNom's account until the
registration expires again, at least under the procedures in
place at eNom when it acquired the "philbricksports.com" and
"philbrickssports.net" domains.  A domain name remaining in
eNom's account is "parked"--an industry term referring to
associating the domain name with a web page that displays
content, including links and a search function.  Under an
agreement between eNom and Yahoo!, Yahoo! generates the links and
other content on eNom's parked web pages, and eNom receives
revenue each time a visitor clicks on one of those links.[9]

It is undisputed that this was the fate of the
"philbricksports.com" and "philbrickssports.net" domain names:
after Rare Names failed to pay the registration fee, eNom
retained the names for its own account, associating them with web
pages containing content provided by Yahoo![10]  It was this

_____

[9]ENom does, however, control the layout of the website, that
is, how the content supplied by Yahoo! is arranged on the page.

[10]At oral argument, counsel for the plaintiffs represented
that he had contacted an in-house lawyer for RareNames, who had
denied that her company had asked eNom to register the domains.
But no admissible evidence to that effect, e.g. affidavit or
deposition testimony from that witness, or business records from
RareNames, has been submitted.  The statements of plaintiffs'
counsel, then, regardless of his apparent good faith in making
them, do not suffice to dispute eNom's evidence on this point.
See, e.g., Corrada Betances v. Sea-Land Serv., Inc., 248 F.3d 40,
43 (1st Cir. 2001).  Nor does the plaintiffs' point that no
witness for eNom had personal knowledge of how the domain names

11

content, i.e., the "Welcome to Philbricksports.com" greeting and
the links labeled "Hockey Equipment," "Skis," "Home and Garden,"
and the like, that Philbrick encountered at the
"philbricksports.com" domain name in January 2007 and thereafter.
There is no evidence as to how Yahoo! selected this particular
content to appear on the "philbricksports.com" website.[11]

On August 10, 2007, less than a month after the plaintiffs
commenced this lawsuit, eNom removed all of the content from the
"philbricksports.com" website, but retained the domain name, it
says, in adherence to the Uniform Domain Name Dispute Resolution
Policy that, as a domain name registrar, it is bound to follow.
See 4 Thomas J. McCarthy, McCarthy on Trademarks & Unfair
Competition § 25:74.75, at 25-257 (4th ed. 1992 & 2008 supp.).
Before shedding the "philbricksports.com" site, eNom earned
$183.29 in revenue based on visitors' clicking the links there,

---

came to be registered, but based their testimony on reviewing
records from the company's databases.  As discussed infra at Part
III.A, a corporation's officers or employees may testify to its
actions, particularly when that testimony is based on information
contained in the corporation's records.

[11]There is no evidence at all as to the content of the
"philbricksports.net" site, but it is undisputed that eNom
deleted all content from the site and dropped the domain name
from its account on November 24, 2005, the day after registering
the domain on behalf of Rare Names.  In deciding the summary
judgment motions, the court has assumed that the content of the
"philbricksports.net" site, during its brief existence, was
virtually identical to that of the ".com" version.

12

as provided by its contract with Yahoo![12]  There is no evidence,
however, that any of those clicks came from users who encountered
the site while attempting to find the plaintiffs' business on-
line.  Based on the record as it stands, in fact, the
"philbricksports.com" site was mistakenly visited by only one
customer looking for the plaintiffs, and she realized that the
site was not theirs.[13]

   During the pendency of this litigation, the plaintiffs found
another website, "philbrickssports.net"--which differs from one
of the other names registered by eNom, "philbricksports.net," in
the addition of an "s"--containing content similar to that
formerly observed on the "philbricksports.com" site (with similar
results when the word "adult" was typed into the search
function).  This domain name, also like "philbricksports.com" and

---

   [12]It is agreed that eNom did not earn any revenue from
activity on the "philbricksports.net" site which, again, was
operational for only one day.

   [13]ENom points out that the plaintiffs cannot say whether
this customer visited one of their sites or another site operated
by a third party; drawing all inferences in the plaintiffs'
favor, however, the court will assume that this customer did in
fact visit eNom's "philbricksports.com" site.  In contrast, one
of Dover's employees gave a third-hand account in which another
customer had told the employee's wife that the customer "tried to
get to [the plaintiffs'] website to buy something and couldn't."
Standing alone, which is how the plaintiffs present it, this
statement simply cannot support an inference that the customer
mistakenly found the "philbricksports.com" site while looking for
the plaintiffs'.

"philbricksports.net," was registered "[care of] eNom, Inc. on behalf of eNom, Inc. customer," as of March 5, 2008.

ENom has submitted a declaration from one of its senior vice presidents, Charles Ursini, explaining its registration of the "philbrickssports.net" domain name.[14]  Ursini states that, after the name had been made available to the public by a domain name registry, eNom registered "philbrickssports.net" on March 3, 2008; this action was "carried out automatically by the operation of eNom's computer systems, and not as the result of a specific request by any individual eNom employee."  Taking the summary judgment record in the light most favorable to the plaintiffs, it appears that this refers to an algorithm eNom has developed to evaluate the desirability of particular domain names based, at least in part, on how effective they are in attracting user traffic.  After eNom acquires a domain name in this manner, it associates it with a website and content, which is provided by a third party, like Yahoo!.  It is undisputed that this was the fate of the "philbrickssports.net" name:  it was not acquired in the same way as the "philbricksports.com" and ".net" domain names had been, but it was "parked" just like those domains had been.

---

[14]The plaintiffs have filed a motion to strike this declaration, which is denied for the reasons explained infra at Part III.A.

Two days later, however, on March 5, 2008, eNom transferred the name to an account it had created to hold a number of domain names that it had registered in anticipation of transferring them to the plaintiffs.  It is agreed that "philbrickssports.net" no longer had any content associated with it after that point.  ENom earned seventy cents from activity on the site between March 3 and March 5, 2008.  The plaintiffs ultimately amended their complaint to assert claims based on eNom's handling of the "philbrickssports.net" domain name.

## III. <u>Analysis</u>

## A.   **The motions to strike**

As noted at the outset, each side moves to strike certain of the evidentiary materials that the other has submitted in connection with the motions for summary judgment:

> •the plaintiffs' motion to strike one paragraph of and four exhibits to a declaration by Ursini, the entirety of a declaration by a second eNom employee, and two exhibits to a declaration by a third eNom employee, all submitted in support of eNom's summary judgment motion (docket no. 75);
>
> •(2) eNom's motion to strike two paragraphs of and two exhibits to an affidavit by Philbrick submitted in opposition to eNom's summary judgment motion (docket no. 85);
>
> •(3) as just noted, the plaintiffs' motion to strike the entirety of a second declaration by Ursini (and its

exhibits) submitted in opposition to the plaintiffs'
motion for summary judgment (docket no. 90).

In ruling on the summary judgment motions, the court has
disregarded the evidence challenged by the plaintiffs' first
motion to strike (docket no. 75), and has fully considered the
evidence challenged by eNom's motion to strike (docket no. 90).
Because, as fully explained <u>infra</u>, the court nevertheless grants
eNom's motion for summary judgment in its entirety, those two
motions are moot.  See <u>L'Etoile v. New Eng. Finish Sys., Inc.</u>,
2008 DNH 163, 2; <u>Evans v. Taco Bell Corp.</u>, 2005 DNH 132, 10.

The court has, however, considered some of the evidence
challenged by the plaintiffs' second motion to strike (docket no.
90), i.e., parts of Ursini's testimony as to eNom's handling of
the "philbrickssports.net" domain name.  The plaintiffs seek to
strike this testimony in its entirety because, when they took his
deposition as eNom's designate under Rule 30(b)(6) of the Federal
Rules of Civil Procedure, he professed ignorance of how eNom had
come to register "philbrickssports.com."  Offering his testimony
on that subject now, the plaintiffs argue, means that eNom failed
to prepare Ursini for the deposition in derogation of its duty
under Rule 30(b)(6).[15]

_____

[15]For purposes of the foregoing discussion, the court
assumes that striking Ursini's testimony, rather than compelling
eNom to produce a witness prepared to testify about the

16

Rule 30(b)(6) requires an entity served with a deposition notice to "designate one or more . . . persons who consent to testify on its behalf . . . about information known or reasonably knowable to the organization." Fed. R. Civ. P. 30(b)(6). As this language indicates, an entity producing a witness for a Rule 30(b)(6) deposition must ensure that he or she has been educated on what the entity, as a corporate personage, "knows" or could reasonably find out. See Briddell v. St. Gobain Abrasives Inc., 233 F.R.D. 57, 60 (D. Mass. 2005); Calzaturficio S.C.A.R.P.A., s.p.a. v. Fabiano Shoe Co., 201 F.R.D. 33, 36 (D. Mass. 2001) (collecting cases). But there is one important limitation on this obligation:  it extends only so far as the party issuing the deposition notice has honored its own obligation to "describe with reasonable particularity the matters for examination." Fed. R. Civ. P. 30(b)(6).

An entity producing a witness in response to a Rule 30(b)(6) notice, then, does not vouch for his or her ability to speak to other matters. See, e.g., King v. Pratt & Whitney, 161 F.R.D.

_____

"philbrickssports.com" domain, would be the proper remedy, on the theory that eNom's alleged failure to produce an adequately prepared Rule 30(b)(6) witness amounts to its failure to appear for a deposition, thus triggering the sanctions available under Rule 37(d)(3) (which include prohibiting a party from introducing the discoverable evidence under Rule 37(b)(2)(A)(ii)).  See, e.g., Cont'l Cas. Co. v. Compass Bank, No. 04-766, 2006 WL 533510, at *17 (S.D. Ala. Mar. 3, 2006) (collecting cases).

475, 476 (S.D. Fla. 1995), <u>aff'd</u>, 213 F.3d 646 (11th Cir. 2000);

<u>Paparelli v. Prudential Ins. Co. of Am.</u>, 108 F.R.D. 727, 729-30

(D. Mass. 1985).[16]  In other words, "if the deponent does not

know the answer to questions outside the scope of the matters

described in the notice, then that is the examining party's

problem."  <u>King</u>, 161 F.R.D. at 476; <u>see also</u>, <u>e.g.</u>, <u>Todd v.</u>

<u>Precision Boilers, Inc.</u>, No. 07-0112, 2008 WL 4722338, at *3

(W.D. La. Oct. 24, 2008); <u>Kawasaki Kisen Kaisha, Ltd. v. All City</u>

<u>Auto Used Parts, Inc.</u>, No. 07-86, 2008 WL 423456, at *2 (M.D.

Fla. Feb. 13, 2008).

The plaintiffs' notice of deposition to eNom did not

describe its handling of the "philbrickssports.net" domain name,

listing areas of inquiry limited principally to the company's

overall "methods, policies, and procedures."  The notice's only

reference to eNom's handling of any of the domain names at issue,

---

[16]<u>Paparelli</u> holds that a Rule 30(b)(6) designate cannot even
be questioned about matters outside of the deposition notice.
108 F.R.D. at 729-30.  Most courts have rejected that view; they
hold instead that a witness produced under the rule can be asked
about any subject that is otherwise discoverable, <u>see</u> 8A Charles
Alan Wright <u>et al.</u>, <u>Federal Practice & Procedure</u> § 2103, at 14
(2d ed. 1994 & 2008 supp.) (citing cases), reasoning, like <u>King</u>,
that the matters set forth in the deposition notice are simply
"the minimum about which the witness must be prepared to
testify."  <u>Detoy v. City & County of S.F.</u>, 196 F.R.D. 362, 366
(N.D. Cal. 2000).  This court need not resolve that disagreement
here, because, under either view, eNom was not obligated to
ensure that Ursini could testify on subjects beyond those listed
in the notice.

in fact, mentioned only "philbricksports.com" and ".net," i.e.,
with one "s," to the exclusion of "philbrickssports.net."  So
eNom was under no obligation to ensure that Ursini could answer
questions about its handling of that domain name.  His inability
to do so at the deposition provides no basis for striking his
statements on that subject in his declaration.

By the same reasoning, Ursini's declaration cannot be
stricken as "an attempt to manufacture an issue of fact in order
to survive summary judgment" by contradicting his prior
deposition testimony.  <u>Orta-Castro v. Merck, Sharp & Dohme</u>
<u>Quimica P.R., Inc.</u>, 447 F.3d 105, 110 (1st Cir. 2006).  As the
court of appeals has instructed, "in applying this rule, it is
critical that there be no satisfactory explanation since lapse of
memory, new sources of information or other events can often
explain a revision of testimony."  <u>Hernandez-Loring v.</u>
<u>Universidad Metropolitana</u>, 233 F.3d 49, 54 (1st Cir. 2000)
(internal quotation marks omitted).

Ursini indeed stated at his deposition that he did not know
how eNom had come to register the "philbrickssports.net" domain
name, having just become aware of the fact of the registration
itself four days beforehand.  In his declaration, however, he
states that, while he "had not been asked to familiarize
[himself] with" this subject prior to his deposition, he has

19

since done just that, chiefly by reviewing the relevant business records.  Because, again, the notice of eNom's deposition made no reference to the "philbrickssports.net" domain name, Ursini's explanation for not knowing then what he knows now is satisfactory.  See <u>Net 2 Press, Inc. v. 58 Dix Ave. Corp.</u>, 266 F. Supp. 2d 146, 153 (D. Me. 2002) (denying motion to strike affidavit, based on contradiction between affiant's claimed lack of memory of events at his deposition and claimed memory upon submitting affidavit, where affiant explained that he had reviewed documents in the interim to refresh his memory).[17]

The plaintiffs also move to strike Ursini's declaration because he lacks personal knowledge of the matters it describes. A declaration submitted in connection with a summary judgment motion "must be made on personal knowledge, set out matters that would be admissible in evidence, and show that the affiant is

---

[17]The plaintiffs suggest that, even if Ursini himself did not know prior to the deposition that the "philbrickssports.net" domain name had become an issue in the litigation (a proposition which they describe as "very unlikely" in its own right), eNom certainly did.  First, the plaintiffs have offered nothing to back up their insinuation that Ursini did, contrary to his deposition testimony, have knowledge at that point about how eNom had come to register the "philbrickssports.net" domain name; Ursini stated, in fact, that he had only just learned that eNom had even registered the name.  Second, eNom's awareness of a potential claim based on its handling of the name did not require it to prepare Ursini to discuss it at the deposition, because, again, the subject was not described in the Rule 30(b)(6) notice.

competent to testify on the matters stated." Fed. R. Civ. P. 56(e)(1); see also Fed. R. Evid. 602. The plaintiffs say that Ursini's declaration, insofar as it recounts eNom's handling of the "philbrickssports.net" name, does not qualify because it "consists of conclusions drawn from the work of others," i.e., fellow eNom employees who, Ursini states, retrieved data from eNom's records "to reconstruct the history of the domain name since its registration by eNom."

As eNom points out, however, the officers of a corporation, like Ursini, are generally treated as having personal knowledge of their corporation's acts. See, e.g., Humboldt Express, Inc. v. Wise Co. (In re Apex Express Corp.), 190 F.3d 624, 635 (4th Cir. 1999); Exp.-Imp. Bank of U.S. v. Asia Pulp & Paper Co., No. 03-8554, 2008 WL 465169, at *1 n.4 (S.D.N.Y. Feb. 6, 2008); Edwards v. Toys "R" Us, 527 F. Supp. 2d 1197, 1201 (C.D. Cal. 2007) (citing cases); Findlay Indus., Inc. v. Bohanon, No. 07-1210, 2007 WL 2669191, at *4 (N.D. Ohio Aug. 14, 2007). So Ursini can permissibly testify to eNom's actions, including its handling of the "philbrickssports.net" domain name, by virtue of his position with the company, regardless of whether he personally performed or participated in them.

Furthermore, "[i]t is axiomatic that a corporate representative may testify and submit affidavits based on

21

knowledge gained from a review of books and records." <u>Harrison-Hoge Indus., Inc. v. Panther-Martin S.R.L.</u>, No. 05-2851, 2008 WL 905892, at \*28 (E.D.N.Y. Mar. 31, 2008) (citing cases); <u>see also</u>, <u>e.g.</u>, <u>FDIC v. Selaiden Builders, Inc.</u>, 973 F.2d 1249, 1254 n.12 (5th Cir. 1992); <u>Balut v. Loral Elec. Sys.</u>, 988 F. Supp. 339, 353 (S.D.N.Y. 1997), <u>aff'd</u>, 166 F.3d 1199 (1st Cir. 1998).  As Ursini expressly states in his declaration, its account of eNom's handling of the "philbrickssports.net" domain name is based on his review of eNom's relevant records, many of which are appended to the declaration itself.  Absent some reason to doubt the authenticity of those documents (and there is none), Ursini can testify as to what they indicate to him in light of his claimed "understanding of the processes by which eNom acquires and manages domain names," even if he did not personally retrieve the documents from eNom's databases.  The plaintiffs provide no authority supporting their exceedingly strict view of the personal knowledge requirement in this context.  Their motion to strike the declaration is denied.[18]

---

[18]The court acknowledges that one of the statements in Ursini's declaration does exceed his personal knowledge:  his conclusion as to why another eNom employee decided to transfer the "philbrickssports.net" domain name to the account holding other names for potential transfer to the plaintiffs.  Without foundation, one witness may not testify as to what was in the head of another.  <u>See</u> Fed. R. Evid. 602.  But the court has not considered this statement (set forth in ¶ 9 of the declaration)

**B.    The summary judgment motions**

The plaintiffs' amended complaint asserts nine separate

numbered counts against eNom:

- cybersquatting in violation of § 3002(a) of the ACPA, 15 U.S.C. § 1125(d) (Count 1);

- cyberpiracy of a personal name in violation of § 3002(b) of the ACPA, 15 U.S.C. § 1129 (Count 2);

- false designation of origin in violation of § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(a) (Count 3);

- false advertising in violation of § 43(b) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(B) (Count 4);

- unfair competition and unfair or deceptive practices in violation of the New Hampshire Consumer Protection Act, N.H. Rev. Stat. Ann. § 358-A (Count 5);

- trademark infringement under New Hampshire common law (Count 6);

- unfair competition under New Hampshire common law (Count 7);

- "unjust enrichment/disgorgement" (Count 8); and

- false light invasion of privacy (Count 9).

As noted at the outset, the plaintiffs have moved for summary

judgment on Count 1 of their complaint; eNom has cross-moved for

summary judgment on all of the plaintiffs' claims.[19]

_____

in ruling on the summary judgment motions.

[19]While the plaintiffs' motion for summary judgment on Count 1 addressed the "philbrickssports.net" domain name, eNom's motion for summary judgment on all counts did not.  Given the substantial overlap between the issues raised by the different

**1.    Counts 1, 3, and 5-8 (Cybersquatting and Federal and State Law Trademark Infringement)**

**a.    Count 1 (Cybersquatting)**

The plaintiffs' cybersquatting claim (Count 1), as their own motion for summary judgment suggests, is the centerpiece of their lawsuit against eNom.  This claim lies under § 3002(a) of the ACPA, which provides, in relevant part:

> A person shall be liable in a civil action by the owner of a mark, including a personal name which is protected as a mark under this section, if, without regard to the goods and services of the parties, that person
>
> > (i) has a bad faith intent to profit from that mark, including a personal name which is protected as a mark under this section; and
> >
> > (ii) registers, traffics in, or uses a domain name that--
> >
> > (I) in the case of a mark that is distinctive at the time of registration of the domain name, is identical or confusingly similar to that mark; or
> >
> > (II) in the case of a famous mark that is famous at the time of registration of the domain name, is identical or confusingly similar to or dilutive of that mark . . . .

15 U.S.C. § 1125(d)(1)(A).  ENom seeks summary judgment on this claim on a number of grounds, including (1) as a "domain name

---

domain names, however, the court asked the parties at oral argument whether they objected to considering summary judgment in favor of either side on claims arising out of the "philbrickssports.net" domain.  There was no objection.

registrar," it is immune from damages under the ACPA for its mere "registration or maintenance of a domain name for another absent a showing of bad faith intent to profit from such maintenance or registration of the domain name," 15 U.S.C. § 1114(2)(D)(iii), which cannot be shown, (2) regardless of eNom's status or actions as a "domain name registrar," the lack of proof of its "bad faith intent to profit" from the "Philbrick's Sports" mark means that the plaintiffs cannot prove liability under § 1125(d)(1)(A), (3) eNom did not "register[], traffic[] in, or use[]" the domain names at issue, independently dooming the plaintiffs' cybersquatting claim, and (4) the "Philbrick's Sports" mark was neither famous nor distinctive at the time the "philbricksports" domain names were registered, also independently dooming the plaintiffs' cybersquatting claim.

ENom's first and third arguments depend on the view that, because it initially registered the "philbricksports.com" and ".net" domain names on behalf of a third party, it cannot be liable for cybersquatting--even though eNom later transferred those domain names to its own account, "parked" them by associating them with web pages, including links, and earned revenue based on visitors' clicking on those links. The court finds the proposition advanced by eNom--that this conduct amounts to "registration or maintenance of a domain name for another," as

25

opposed to "use" of a domain name for eNom's own benefit--to be
troubling, to say the least.  But the court need not reach this
argument, or eNom's theory that it lacked the requisite "bad
faith intent" to profit from the "Philbrick's Sports" mark,
because the plaintiffs cannot prove that the mark was famous or
distinctive at the time the domain names were registered.

### i.  "Philbrick Sports" is not famous

The plaintiffs first argue that the "Philbrick Sports" mark
is famous, but there is no way they can prove that.  Though the
ACPA does not independently define "famous mark," the Lanham Act
(into which the ACPA was incorporated) does, and the plaintiffs
agree that this definition controls here.  See IBP, Inc. v.
Alvarez, 546 U.S. 21, 34 (2005) ("identical words used in
different parts of the same statute are generally presumed to
have the same meaning").  Under the Lanham Act, "a mark is famous
if it is widely recognized by the general consuming public of the
United States as a designation of the source of the goods or
services of the mark's owner."  15 U.S.C. § 1125(c)(2)(A).  This
standard, as the statutory language indicates, is "rigorous" and
"extends protection only to highly distinctive marks that are
well-known throughout the country."  Green v. Fornario, 486 F.3d
100, 105 (3d Cir. 2007).

There is no evidence that the degree of recognition of the "Philbrick Sports" mark approaches this standard.  The plaintiffs rely on their use of the mark for twenty-five years, and their sales "to customers in all 50 states," but even assuming, for the moment, that these sales occurred under the "Philbrick's Sports" mark, <u>but see infra</u> Part II.B.1.a.iii, these facts are manifestly insufficient to create a genuine issue as to whether the mark is famous.[20]  <u>Cf.</u> <u>Jada Toys, Inc. v. Mattel, Inc.</u>, 518 F.3d 628, 635 (9th Cir. 2008) (ruling that "Hot Wheels" mark for toy cars could be found famous based on more than 37 years of use, $350 million in advertising, and sales of 3 billion units).

### ii.  "Philbrick Sports" is descriptive

The plaintiffs also argue that the "Philbrick's Sports" mark is "distinctive"--a term which, like "famous," they agree has the same meaning under the ACPA as it does under the balance of the Lanham Act, <u>see</u> <u>Two Pesos, Inc. v. Taco Cabana, Inc.</u>, 505 U.S. 763, 768 (1992).  Marks fall into five categories of

---

[20]The plaintiffs, as holders of a non-famous mark, are in good company.  Among the marks that courts have ruled not to be famous under the Lanham Act are "Blue Man Group" for the performing troupe, "Clue" for the board game, and "Trek" for bicycles.  <u>See</u> 4 McCarthy, <u>supra</u>, § 24:110, at 24-316--24-319. In contrast, marks that have been ruled famous include "Nike," "Pepsi," and "Victoria's Secret."  <u>See</u> <u>id.</u> § 24:107, at 24-311.

27

distinctiveness:  generic, descriptive, suggestive, fanciful, and
arbitrary.  Colt Def. LLC v. Bushmaster Firearms, Inc., 486 F.3d
701, 705 (1st Cir. 2007).  Where a mark falls along this spectrum
presents an issue of fact, Boston Beer Co. Ltd. P'ship v. Slesar,
9 F.3d 175, 180 (1st Cir. 1993), but, like other such issues, may
be decided on summary judgment if appropriate, Colt Def., 486
F.3d at 708.  The significance of categorizing a mark is that
suggestive, arbitrary, and fanciful marks are considered
inherently distinctive, while a descriptive mark becomes
distinctive only upon a showing of secondary meaning.  Two Pesos,
505 U.S. at 769.  The plaintiffs argue that their "Philbrick's
Sports" mark is suggestive and therefore inherently distinctive,
while eNom argues that the mark is descriptive, which requires
the plaintiffs to prove secondary meaning.

    "'A term is suggestive if it requires imagination, thought
and perception to reach a conclusion as to the nature of goods.
A term is descriptive if it forthwith conveys an immediate idea
of the ingredients, qualities or characteristics of the goods.'"
Equine Techs., Inc. v. Equitechnology, Inc., 68 F.3d 542, 544
(1st Cir. 1995) (quoting Blinded Veterans Ass'n v. Blinded Am.
Veterans Found., 872 F.2d 1035, 1040 (D.C. Cir. 1989)).  The
court agrees with eNom that the term "Philbrick's Sports" is
descriptive, because it readily conveys the nature of the goods,

i.e., sports equipment, without requiring any degree of imagination. Cf. Attrezzi, LLC v. Maytag Corp., 436 F.3d 32, 38 (1st Cir. 2006) (upholding finding that Italian word for "tools," used to sell kitchen appliances, was suggestive because "the term can easily be viewed as suggesting a similarity, not an identity, between ordinary workman's tools and electrical appliances"). The plaintiffs argue that their mark is not descriptive because it "does not literally describe a product," but that is in fact precisely what it does, at least if one believes (as does the court) that the term "sports" usually denotes "sporting goods." The plaintiffs have presented no contrary evidence as to the generally understood meaning of "sports" in this context.[21]

The parties disagree over what impact the appearance of "Philbrick's" in the mark has on its classification as a descriptive or suggestive mark. "Philbrick," after all, is a personal name, and "[p]ersonal names are included in the class of common words that may not secure protected trademark status until

_____

[21]At oral argument, the plaintiffs suggested that "sports" could refer, for example, to the representation of athletes in business matters. While this is a fair point, it is not enough, in the court's view, such that "information about the product or service given by the term used as a mark is indirect or vague," rendering it suggestive. 2 McCarthy, supra, § 11:19, at 11-35. Again, there is no evidence that anyone understood the mark that way, and it must be remembered that classifying of a mark as descriptive or suggestive is a matter of proof, not speculation as to a range of possible meanings. See id. at 11-37.

secondary meaning has attached." Flynn v. AK Peters, Ltd., 377
F.3d 13, 20 (1st Cir. 2004). Because "Philbrick's Sports" simply
adds a personal name to the descriptive term "Sports," eNom
argues, the sum cannot be greater than the whole of its parts:
the result is a descriptive mark. See Christopher D. Smithers
Found., Inc. v. St. Luke's-Roosevelt Hosp., No. 00-5502, 2003 WL
115234, at *7 (finding "The Smithers Foundation" and like marks
"descriptive because they contain the descriptive 'Smithers'
surname and the descriptive word 'Foundation'"); 4A Rudolf
Callman, Callman on Unfair Competition, Trademarks and Monopolies
§ 26:42, at 26-344 (Louis Altman & Malla Pollack, eds., 4th ed.
2004 & 2006 rev.) While this reasoning might not necessarily
apply to all combinations of descriptive terms, see 2 McCarthy,
supra, § 11:26, at 11-66--11-68, it applies here, in the absence
of proof that "Philbrick's Sports" signifies anything but a
sporting-goods business associated with someone named Philbrick.

The plaintiffs also argue that "[b]ecause Philbrick is an
uncommon surname, the consuming public is unlikely to view the
name as solely a personal name." While the plaintiffs rely on
census data to support their premise, their conclusion does not
follow. It is true that "even if a mark consists of an actual
personal name, secondary meaning will be required only if the

public perceives the mark to be a personal name."  2 McCarthy,
supra, § 13:2, at 13-6.1 (footnote omitted).

     Here, however, the rareness of the name alone does not
create a genuine issue of fact as to whether the public thinks of
"Philbrick's Sports" as a personal name, because there is no
reason--either inherent in the mark or in the form of proof as to
actual customer attitudes--to believe the public thinks
otherwise.  "The mere fact that a surname is rare does not keep
it from being primarily merely a surname, particularly where it
has not been shown to possess any better known significance."  4A
Callman, supra, § 26:42, at 26-348--26-349 (footnote omitted).
Indeed, the mark incorporates not just a personal name, but its
possessive form, "Philbrick's," which serves as an "additional
marker[] pointing to its surname significance."  Lane Capital
Mgmt., Inc. v. Lane Capital Mgmt., Inc., 192 F.3d 337, 347 (2d
Cir. 1999).  There is no legitimate dispute that "Philbrick's
Sports" is descriptive, i.e., that it denotes a sporting goods
business owned by or affiliated with someone named Philbrick.[22]

_____

          [22]The plaintiffs rely heavily on In re Hutchinson Technology
Inc., 852 F.2d 552 (Fed. Cir. 1988), but that case is inapposite.
There, the court ruled that the United States Patent and Trade
Office had mistakenly concluded that "Hutchinson Technology" was
descriptive as a mark for certain kinds of electronic components
because the term "'technology' is used on many goods similar to"
the applicant's, without considering whether it was descriptive
of the applicant's goods.  Id. at 554-55.  Here, there is no

### iii. "Philbrick's Sports" has not acquired secondary meaning

Because the mark is not inherently distinctive, the plaintiffs must prove distinctiveness by showing that "Philbrick's Sports" has acquired secondary meaning. "This showing requires the trademark holder to establish that 'in the minds of the public, the primary significance of [the mark] is to identify the source of the product rather than the product itself.'" <u>Borinquen Biscuit Corp. v. M.V. Trading Corp.</u>, 443 F.3d 112, 116 (1st Cir. 2006) (quoting <u>Inwood Labs., Inc. v. Ives Labs., Inc.</u>, 456 U.S. 844, 851 n.11 (1982)). Proving secondary meaning has been the downfall of several trademark claims previously brought in this court, <u>see</u>, <u>e.g.</u>, <u>Ligotti v. Garofalo</u>, 562 F. Supp. 2d 204, 218-220 (D.N.H. 2008); <u>MJM Prods. v. Kelley Prods., Inc.</u>, 2003 DNH 159, 14-22, including by one of the plaintiffs here, albeit over a different trademark, <u>Dover Sports, Inc. v. Hockey.com, Inc.</u>, No. 04-448, 2005 WL 6202334, at *5-*8 (D.N.H. Jan. 28, 2005).

This is not altogether surprising, because "'[p]roof of secondary meaning entails vigorous evidentiary requirements,'"

---

question that "Sports," or, more accurately, "Philbrick's Sports," describes the plaintiffs' goods. The <u>Hutchinson</u> court further observed that "'technology' is a very broad term which includes many categories of goods," <u>id.</u> at 555, which is not true of the term "Sports," as just discussed.

32

ultimately, "that a 'substantial portion of the consuming public associates [the mark] specifically with [the plaintiff's] business'" and, furthermore, that "these consumers base purchasing decisions upon seeing the trademark on the product." Flynn, 377 F.3d at 20 (quoting Boston Beer, 9 F.3d at 181-82) (parenthetical omitted).  The existence of secondary meaning is an issue of fact, but, like the classification of a mark, may be decided on summary judgment in an appropriate case.  See id.

   "The only direct evidence probative of secondary meaning is customer surveys and testimony of individual consumers." Yankee Candle Co. v. Bridgewater Candle Co., 259 F.3d 25, 43 (1st Cir. 2001).  Here, the plaintiffs have not come forward with any such evidence, leaving their case for secondary meaning in "Philbrick's Sports" to circumstantial proof.  Circumstantial evidence of secondary meaning includes, but is not necessarily limited to:  (1) the length and manner of the mark's use, (2) the nature and extent of its advertising and promotion, (3) the efforts made to promote a conscious connection between the mark and the product's source, (4) the product's established place in the market, and (5) proof of the defendant's intentional copying of the mark.  MJM Prods., 2003 DNH 159, 17 (citing Yankee Candle, 259 F.3d at 43-44, and I.P. Lund Trading ApS v. Kohler Co., 163 F.3d 27, 41 (1st Cir. 1998)); see also Flynn, 377 F.3d at 20.  A

33

party need not prove the existence of all these factors in order to demonstrate secondary meaning.  <u>MJM Prods.</u>, 2003 DNH 159, 17.

In attempting to show a genuine issue of material fact on whether "Philbrick's Sports" has achieved secondary meaning, the plaintiffs rely heavily on what they characterize as eNom's "intentional copying" of the mark.  Citing to Fourth Circuit authority, the plaintiffs argue that "evidence of intentional, direct copying establishes a prima facie case of secondary meaning sufficient to shift the burden of persuasion to the defendant on that issue."  <u>Larsen v. Terk Techs. Corp.</u>, 151 F.3d 140, 148 (4th Cir. 1998) (emphasis added).  But, as this court has previously observed, that is a minority view that does not hold sway in the First Circuit, which follows the majority view that intentional copying is simply one of "the factors to be considered in evaluating secondary meaning, rather than assigning it any special weight."  <u>MJM Prods.</u>, 2003 DNH 159, 17-18 (citing <u>Yankee Candle</u>, 259 F.3d at 44, and 2 McCarthy, <u>supra</u>, § 15:38).

This precedent notwithstanding, the plaintiffs devoted much of their briefing and oral argument on secondary meaning to their claim for intentional copying based on eNom's "business model," <u>viz.</u>, the use of sophisticated technology to guide mass registrations of domain names that have shown potential in attracting traffic.  But the propriety of that model in general

34

is simply not the issue before this court.  In fact, the business
model's only relevance at all is to eNom's registration of the
"philbrickssports.net" domain name, because, whatever the
sincerity of the plaintiffs' belief to the contrary, it is
undisputed on the record before the court that the other two
domain names, "philbricksports.com" and ".net," were registered
by eNom at the behest of a third party, Rare Names.  They were
not chosen, at least by eNom, because of their perceived ability
to attract traffic and, even assuming that Rare Names's reason
for wanting to register the domains was somehow chargeable to
eNom, but see 15 U.S.C. § 1114(2)(D)(iii), there is no evidence
of what that reason was either.

        The court acknowledges that eNom's continued registration of
the "philbricksports.com" name, as contrasted with its prompt
dropping of the ".net" alternative, potentially has some
significance:  perhaps, using the same technology it employs in
judging which domains to register to itself, eNom decided that
the ".com" version had traffic-generating potential and the
".net" site did not.  But that remains pure conjecture on the
record as it stands, which establishes that eNom transferred both
names to itself when Rare Names failed to remit payment, just as
eNom does every time a customer stiffs it on a registration fee,
and provides no clue as to why eNom went on to drop one name but

not the other.  The court is left to conclude, as any rational factfinder would have to, that eNom's challenged business model did not inform its initial or continued registration of "philbricksports.com" and ".net."

The court must also conclude, viewing the record in the light most favorable to the plaintiffs, that eNom did register the "philbrickssports.net" name in line with that business model, i.e., because its sophisticated technology identified that name as a potential target for Internet traffic.  But the question remains whether this amounts to "intentional copying" of the plaintiffs' "Philbrick Sports" mark.

Before answering that question, it is worth remembering why it is being asked in the first place--because intentional copying of a mark is one kind of circumstantial evidence tending to show the mark's secondary meaning and thus its eligibility for protection under the law, not because "intentional copying" is independently actionable in its own right.  As Professor McCarthy has put it, "evidence that a junior user exactly copied unprotected descriptive . . . public domain words or shapes does not prove any legal or moral wrong(s)."  2 McCarthy, supra, § 15:38, at 15-63 (footnote omitted).  That is why the majority of courts, including the First Circuit and this one, generally decline to infer that a mark has secondary meaning exclusively or

even principally from the fact that the defendant has copied it;
if a descriptive mark has no secondary meaning, others are free
to use it at will, so the fact that they have says little if
anything about whether the mark is valid in the first place.  See
id. at 15-61--62; see also MJM Prods., 2003 DNH 159, 18.

Here, based on the substantial overlap between the
collection of links on the "philbrickssports.net" site and the
plaintiffs' wares, e.g., "Ice Hockey Equipment," "Skis," "Soccer
Net," it is perhaps reasonable to surmise that those terms were
associated with this domain name because Yahoo! determined that
Internet users often searched for one or more of those terms and
"Philbrick's Sports" in conjunction.  This, the plaintiffs
suggest, amounts to a tacit concession that consumers associate
those terms, and the goods they describe, with their mark.

As an initial matter, the court notes that there is in fact
no evidence that the links were associated with the domain for
this reason.  Nor, more importantly, is there evidence of the
threshold of search activity necessary for Yahoo! to associate
certain terms with a domain name to the exclusion of others.  If,
for example, Yahoo! placed "Ice Hockey Equipment" on the site
based on ten, or even one hundred, searches for that term in
connection with "Philbrick's Sports" over, say, a one-month
period, that hardly suggests an association between the mark and

37

the plaintiffs' business sufficient to find secondary meaning. This court has previously observed that Internet traffic, even to a plaintiff's own website named for its mark, does not in itself tend to contribute much to the mark's significance. <u>Ligotti</u>, 562 F. Supp. 2d at 219 n.27 (citing <u>DeGidio v. W. Group Corp.</u>, 355 F.3d 506, 513 (6th Cir. 2004)).

Furthermore, given the circular nature of inferring secondary meaning from intentional copying, the court of appeals has held--as this court noted in <u>Dover Sports</u>--that "intentional copying suggests secondary meaning only when it 'is not just the intent to copy, but to 'pass off' one's goods as those of another.'" 2005 WL 6202334, at *8 (quoting <u>Yankee Candle</u>, 259 F.3d at 45). And "'"[passing] off" means fraud; it means trying to get sales from a competitor by making consumers think they are dealing with that competitor, when actually they are buying from the passer off.'" <u>Id.</u> (quoting <u>Blau Plumbing, Inc. v. S.O.S. Fix-It, Inc.</u>, 781 F.2d 604, 611 (7th Cir. 1986)). "Passing off" does not mean, as the court of appeals ruled in <u>Yankee Candle</u>, intentionally designing one's products to look more like the plaintiff's, 259 F.3d at 44, or even, as in <u>Dover Sports</u>, intentionally using the same mark as one's former associate for a competing venture, provided it was not done in "a scheme to

38

waylay the [latter's] customers and thus a tacit acknowledgment
of the mark's validity."  2008 WL 6202334, at *21-*22.

Of course, that is exactly what the plaintiffs accuse eNom
of doing--registering domains names confusingly similar to
"Philbrick's Sports" and populating them with content designed to
fool a visitor into thinking he or she had reached a website
associated with the plaintiffs' business, including a "Welcome to
philbricksports.com" banner and links describing the very
products the plaintiffs sell.  Leaving aside the formal problems
with this charge, e.g., it was not eNom who decided to register
two of the three names or the content associated with any of
them, there is simply no evidence to support it.

Most significantly, there is no evidence of what happened
when a visitor clicked on any of the links bearing the names of
the products.[23]  As the plaintiffs suspect, the visitor might

---

[23]At oral argument, the plaintiffs faulted eNom for this
state of affairs, making reference to their pending motion for
sanctions against eNom for its alleged spoliation of evidence
relating to the content of the websites at issue, particularly
the "philbrickssports.net" site.  There are two fundamental
problems with this argument.  First, the content of the sites was
not supplied by eNom, but by Yahoo!, and the plaintiffs have not
provided any indication of their efforts to obtain the evidence
in question from Yahoo!  There is no indication, in fact, whether
eNom even made any record of the sites' content at any point, and
it seems doubtful that they would have, considering that they
have 11 million websites under registration.  Second, Philbrick
testified in his deposition that, after discovering the
"philbricksports.com" site, he spent time "researching" its

have been directed to a page offering those products for sale
without identifying the seller, creating the impression that the
seller was the plaintiffs.  That would be "passing off"--assuming
the balance of content on the "philbrickssports.net" page, i.e.,
the photo of the poppy field and the numerous phrases unrelated
to the plaintiffs' business, like "Home and Garden," had not
already alerted the consumer that he or she was not, in fact,
dealing with them.  Cf. Hasbro, Inc. v. Clue Computing, Inc., 232
F.3d 1, 2 (1st Cir. 2000) (upholding finding of no likelihood of
confusion as a matter of law between "clue.com" website for
defendant's computer consulting business and plaintiff's "Clue"
board game where the website's "content strongly indicated that
the site had little to do with [plaintiff's] business").

But the visitor might also have been directed to a number of
other places, including a page (1) offering those products for
sale, but prominently identifying itself as belonging to another
retailer, (2) resembling the "results" page of a search engine,
listing a number of retailers by name and providing links to

---

various links--yet he has not provided any evidence, either
documentary or testimonial, as to where those links led (apart
from a record of what happened when "adult" or "sex" was typed
into the search function).  Philbrick cannot fairly blame eNom
for failing to preserve evidence that he himself did not.
Without more, the court declines to draw a negative inference
against eNom, or to sanction it.

their sites, or (3) hosting content completely unrelated to the subject of the link.  None of these would be "passing off," because consumers would not "think they are dealing with [the plaintiffs], when actually they are buying from the passer off," Dover Sports, 2005 WL 6202334, at *8, assuming, again, they thought they were dealing with the plaintiffs in the first place from the content of the "philbrickssports.net" page.

In light of these possibilities, the court cannot infer, solely from similarities between the text of the links and the plaintiffs' wares, that any of eNom's "philbricks" sites was part of an effort at "passing off" someone else as the plaintiffs as that theory has been understood by this court and the court of appeals.  Philbrick conceded at his deposition, in fact, that he knew of no evidence supporting this theory.  Moreover, the only person who reported having encountered one of eNom's sites while looking for the plaintiffs also reported having realized that the site was not theirs.  The record, viewed in the light most favorable to the plaintiffs--and, it must be said, making a number of assumptions that, while perhaps reasonable, are not backed up by any proof--does not support an inference of "passing off" to suggest secondary meaning in the mark.[24]

---

[24]In support of their intentional copying argument, the plaintiffs rely on Playboy Enterprises, Inc. v. Netscape

The plaintiffs also argue for secondary meaning by way of the other categories of circumstantial evidence. See, e.g., MJM Prods., 2003 DNH 159, 17. But the plaintiffs cannot make more than a meager showing in any of these areas, and the sum of their circumstantial proof does not create a triable issue on whether the mark was "distinctive at the time of registration of the domain name," 15 U.S.C. § 1125(d)(1)(A)(ii)(I), which they must prove to prevail on their cybersquatting claim.

---

Communications Corp., 354 F.3d 1020 (9th Cir. 2004). There, the plaintiff, who held the marks "playboy" and "playmate," brought trademark infringement and dilution claims arising from the defendant search engines' practice of showing, in response to searches for those terms, banner advertisements for sites unrelated to the plaintiff's. Id. at 1022-23. In reversing summary judgment for the defendants on the issue of likelihood of confusion, the court observed, in the passage quoted by the plaintiffs here, "Given that defendants themselves use the terms precisely because they believe that Internet searchers associate the terms with their secondary meanings, disputing the strength of the secondary meanings is somewhat farfetched." Id. at 1027-28. As just discussed, however, there is no evidence here that eNom registered the domain names at issue because searchers associate them with the plaintiffs--nor, for that matter, does eNom, unlike the defendants in Playboy Enterprises, "concede that [it] uses the mark[] for [its] secondary meaning." Id. at 1028. The secondary meaning of the marks "playboy" and "playmate" was not even at issue in that case; the passage on which the plaintiffs rely was part of the court's analysis of the strength of the marks for purposes of the likelihood of confusion analysis, see infra Part II.B.1.b. So Playboy Enterprises does not support the plaintiffs' view that registration of a domain name due to its potential to attract traffic--which is all there is evidence for here--effectively concedes secondary meaning.

First, the plaintiffs claim to have continuously used the "Philbrick's Sports" mark for twenty-five years. This is undisputed, but it is also undisputed that for that entire period, there has been at least one other business in the same area using the name "Philbrick's," at times in conjunction with "Sports." As this court has noted, "'[u]se by others of a similar mark will tend to dilute any consumer recognition and association of that mark with the alleged owner.'" Dover Sports, 2005 WL 6202334, at *6 (quoting 2 McCarthy, supra, § 15:27, at 15-41); see also MJM Prods., 2003 DNH 159, 19-20. The "others" in question were Philbrick's relatives, who unquestionably had the right to use the name as well, but their uses nevertheless tended to diminish the strength of any connection in the mind of consumers between "Philbrick's Sports" and a single source which, again, is what the plaintiffs must prove. See Dover Sports, 2005 WL 6202334, at *6 n.9. Indeed, Philbrick acknowledged that customers were often confused by the multiple "Philbrick" stores.

Second, the plaintiffs rely on their "extensive" promotion of the "Philbrick's Sports" mark, pointing to the $1.5 million they spent advertising the mark between 2000 and 2008. "While evidence of . . . advertising and promotional activities may be relevant in determining secondary meaning, the true test of secondary meaning is the effectiveness of this effort to create

43

it." <u>Yankee Candle</u>, 259 F.3d at 44 (quoting <u>Int'l Jensen, Inc.</u>
<u>v. Metrosound U.S.A., Inc.</u>, 4 F.3d 819, 824 (9th Cir. 1993)).
The sum total of the plaintiffs' advertising expenses, then, says
little on its own about the success of those dollars in creating
a linkage in the mind of consumers.

Though plaintiffs list the various television and radio
stations and publications where they advertised, they provide no
facts as to when they did so, for how long, or how many consumers
might have been exposed to the ads as a result--which, again, is
the crucial question. <u>Cf.</u> <u>MJM Prods.</u>, 2003 DNH 159, 21-22
(finding media mentions of plaintiffs' mark insufficient to show
secondary meaning without "information, such as circulation or
audience statistics, which would enable the court to determine
whether these stories reached enough consumers" to do so).
Indeed, the record indicates that this advertising was limited in
scope to the Seacoast region of New Hampshire and, in some cases,
greater Boston.  The plaintiffs' evidence of advertising the
"Philbrick's Sports" mark provides virtually no support for its

secondary meaning.[25]  <u>See</u> <u>id.</u>; <u>see also</u> <u>Ligotti</u>, 562 F. Supp. 2d
at 219-20; <u>Dover Sports</u>, 2005 WL 6202334, at *6-*7.

     The plaintiffs also rely heavily on their "internet presence
since 1997."  As eNom emphasizes, though, while the plaintiffs
may have been present on the internet during that time, the mark
"Philbrick's Sports" was not, at least as an on-line retailer of
sporting goods.  For most of the relevant period, in fact,
nothing could be purchased through a website bearing the
"Philbrick's Sports" mark:  the one such site with any content,
the "philbricks.net" homepage, contained only general information

_____

     [25]The plaintiffs' reliance on the recent decision by the
court of appeals in <u>Visible Systems Corp. v. Unisys Corp.</u>, ___
F.3d ___, 2008 WL 5338193 (1st Cir. Dec. 23, 2008), is misplaced.
While, in affirming a verdict of trademark infringement in the
plaintiff's favor, the court noted that the plaintiff "had spent
over $2 million to promote the mark since 1987," <u>id.</u> at *6, the
secondary meaning of the plaintiff's mark was not at issue.
What was at issue was "the relative strengths of the marks,"
because the plaintiff had brought a "reverse confusion" case,
which proceeds on the theory that "customers purchase the senior
user's goods under the misimpression that the junior user is the
source of the senior's user's goods . . . because the junior user
saturates the market and overwhelms the senior user, causing harm
to the value of the trademark and the senior user's business."
<u>Id.</u> at *4 (internal quotation marks and footnote omitted).  So
the court considered the plaintiff's advertising expenses in
deciding whether the record "established the identity of [the
plaintiff's] mark, but did not prevent the mark from being
overwhelmed by [the defendant's] mark," <u>id.</u> at *6; in other
words, that the mark was recognizable, but not to recognizable.
The case does not stand for the proposition, then, that $2
million in advertising a mark over twenty years establishes
secondary meaning, particularly in the absence of other evidence.

about the retail store until 2001, and thereafter, until October
2005, redirected visitors who clicked on a "store" button to
other websites that did not bear the "Philbrick's Sports" mark,
"newenglandhockey.com" and "hockey.com." Customers purchasing
items from those sites likely never would have learned they were
dealing with a business called "Philbrick's Sports"; the name did
not even appear on the materials shipped with the purchases. An
"internet presence" under one mark obviously does not serve to
establish secondary meaning in another dissimilar mark. See
Dover Sports, 2005 WL 6202334, at *7.[26] The plaintiffs did not
do business on-line as "Philbrick's Sports" until October 2005--
just one month before eNom registered the "philbricksports.com"
and ".net" domains and about two and a half years before it
registered the "philbrickssports.net" domain. So the plaintiffs'
on-line activities, like their advertising, provide virtually no

---

[26]By relying on sales made under a different mark, in fact,
the plaintiffs are repeating the very same argument one of them
unsuccessfully made in the Dover Sports case. There, Dover
attempted to show secondary meaning in the "hockey.com" mark
based on Dover's "yearly internet sales of approximately
$700,000," but "fail[ed] to indicate what proportion of that
number is traceable to the hockey.com domain name as opposed to
other names that Dover has used in the past or may still be using
at present." 2005 WL 6202334, at *7. Now, as then, "[t]he sales
figure itself therefore has little probative value as to the
secondary meaning" of the plaintiffs' mark. Id.

support for their claim that "Philbrick's Sports" had acquired secondary meaning at either of those times.

That brings the court to the matter of "Philbrick's Sports internet and phone sales during a period between August 2003 and November 2008," totaling about $1.33 million, and "to Washington state during a period between December 2004 and November 2008," encompassing 124 customers. The plaintiffs have not broken these figures down any more specifically, which is a problem because, (1) again, few if any sales from the "hockey.com" website would have exposed the purchaser to the "Philbrick's Sports" mark and (2) eNom registered the domain names at issue in November 2005 and March 2008, so any sales made after those events are essentially irrelevant to whether the mark was "distinctive at the time of registration of the domain name[s]" under the ACPA. See Dover Sports, 2005 WL 6202334, at *7.

Having considered the plaintiffs' circumstantial evidence, the court concludes that the plaintiffs have not demonstrated a genuine issue of material fact as to whether their mark had acquired secondary meaning, particularly outside of the New Hampshire or greater Boston area, at the times that eNom registered any of the domain names at issue. Because, as discussed supra, the plaintiffs also have not demonstrated a triable issue on whether their mark was famous or inherently

47

distinctive at those times, they cannot recover on their cybersquatting claim under 15 U.S.C. § 1125(d)(1)(A).

At oral argument, the plaintiffs decried this result as at odds with the purpose of the ACPA, which they characterize as "redress[ing] the very conduct eNom has made a business in," i.e., "cybersquatting." The "cybersquatting" prohibited by the ACPA, however, is "cybersquatting" on "a mark that is <u>distinctive</u> [or famous] at the time of registration of the domain name." 15 U.S.C. § 1125(d)(1)(A)(ii)(I) (emphasis added). Because the plaintiffs' mark is not distinctive (or famous), it is simply not entitled to protection under the ACPA.

This is not to demean Philbrick's sense that eNom has "stolen his good name" that he, and his family, have worked for many years to protect; it simply reflects the fact that the ACPA, like trademark law generally, protects only "good names" that either inherently are or have become distinctive as trademarks. Had Congress intended broader protections, § 1125(d)(1)(A)(ii)(I) would include "a mark that is a registered trade name" or "a mark that has been used in commerce for twenty-five years without regard to whether it is distinctive," instead of being limited to "a mark that is distinctive." So, whatever might be said about eNom's "business model," either on its own or compared to the plaintiffs' more traditional one, the company does not engage in

48

the "cybersquatting" prohibited by the ACPA unless, among other things, it "squats" on a distinctive or famous mark.  That did not happen here.  ENom is entitled to summary judgment on the plaintiffs' cybersquatting claim (Count 1).

### b.    Counts 3 and 5-8 (federal and state law trademark infringement and unfair competition)

Without inherent distinctiveness or secondary meaning in the "Philbrick's Sports" mark, the plaintiffs also cannot recover on their claim for false designation of origin under § 43(a) of the Lanham Act (Count 3), see, e.g., Two Pesos, 505 U.S. at 769, or their state-law claims of violations of the Consumer Protection Act (Count 5), and common-law trademark infringement, unfair competition, and unjust enrichment (Counts 6-8), see, e.g., Auto Body Specialists, Inc. v. Vallee, 127 N.H. 382, 385 (1985).  The lack of a distinctive mark, then, entitles eNom to summary judgment on these claims as well.[27]

ENom also seeks summary judgment on these claims on an independent basis:  because the plaintiffs cannot demonstrate a genuine issue of material fact on whether a likelihood of confusion arose out of its alleged use of the "Philbrick's

---

[27]As discussed infra at note 29, the plaintiffs do not argue that they can recover on any of their state-law theories without having to show secondary meaning.

Sports" mark.  Though, having ruled as a matter of law that the mark is "not entitled to trademark protection because [it has] not attained secondary meaning, . . . [the] court [does] not need to address the question of likelihood of confusion," Boston Beer, 9 F.3d at 183, the court agrees, essentially for the same reasons that the plaintiffs cannot show secondary meaning as a matter of law, that they also cannot show likelihood of confusion as a matter of law.  See MJM Prods., 2003 DNH 159, 22.

Likelihood of confusion, like secondary meaning, presents an issue of fact, but may be decided as a matter of law in the absence of material factual disputes.  See, e.g., Volkswagenwerk Aktiengesellschaft v. Wheeler, 814 F.2d 812, 815 (1st Cir. 1987). The court of appeals uses eight factors in considering likelihood of confusion, including:  (1) the similarity of the marks; (2) the similarity of the goods; (3) the relationship between the parties' channels of trade; (4) the relationship between the parties' advertising; (5) the classes of prospective purchasers; (6) evidence of actual confusion; (7) the defendants' intent in adopting the plaintiff's mark; and (8) the strength of the plaintiffs' mark.  See Venture Tape Corp. v. McGills Glass Warehouse, 540 F.3d 56, 60-61 (1st Cir. 2008).  "No single criterion is necessarily dispositive in this circumstantial

inquiry," id. at 61, but here, none of the criteria other than
the first weighs heavily in favor of a likelihood of confusion.

As discussed at length in Part II.B.1.a.iii, supra, there is
no evidence that eNom used the "Philbrick's Sports" mark in
connection with any goods, let alone goods similar to the ones
sold by the plaintiffs.  Though the plaintiffs emphasize, again,
that eNom's sites contained links with text describing products
sold by the plaintiffs, the fact remains that there is no proof
that those links connected to sites selling those products and,
even if they did, whether they did so in a way that made their
lack of affiliation with the plaintiffs obvious so as to dispel
any potential confusion.[28]

---

[28]Some courts have held that this situation may nevertheless
give rise to actionable infringement under a theory of "initial
interest confusion."  See, e.g., Audi AG v. D'Amato, 469 F.3d
534, 546 (6th Cir. 2006); Australian Gold, Inc. v. Hatfield, 436
F.3d 1228, 1238-39 (10th Cir. 2006); Promatek Indus., Ltd. v.
Equitrac Corp., 300 F.3d 808, 812-13 (7th Cir. 2002); Savin Corp.
v. Savin Group, 391 F.3d 439, 463 n.13 (2d Cir. 2004); Brookfield
Comm'ns, Inc. v. W. Coast Entm't Corp., 174 F.3d 1036, 1062 (9th
Cir. 1999).  Under this theory, "'although there is no source
confusion in the sense that consumers know they are patronizing
the competitor rather than the plaintiff, there is nevertheless
initial interest confusion in the sense that, by using the
trademark to divert people looking for the plaintiff's web site,
the competitor improperly benefits from the good will that the
plaintiff has developed in its mark.'"  N. Am. Med. Corp. v.
Axiom Worldwide, Inc., 522 F.3d 1211, 1221 (11th Cir. 2008)
(quoting Brookfield Comm'ns, 174 F.3d at 1062) (bracketing
omitted).
    But the plaintiffs do not rely on a theory of initial
interest confusion here, so the court need not consider it.

On the record as it stands, the second factor does not weigh in
the plaintiffs' favor.

       By the same reasoning, the third, fourth, and fifth factors
in the likelihood of confusion analysis, which are generally
considered together, <u>see</u>, <u>e.g.</u>, <u>Attrezzi</u>, 436 F.3d at 39, also do
not favor the plaintiffs.  While both the plaintiffs and eNom
made use of the "Philbrick's Sports" mark on the Internet, there
is no evidence that these uses competed because, once again,
there is no evidence that competing products could be purchased
by following any of the links on the eNom sites, or that this

_____

Furthermore, in <u>Hasbro</u>, <u>supra</u>, the court of appeals described the
theory as a "thicket," upholding the district court's "refusal to
enter" it "in a case involving such disparate products and
services . . . given the unlikelihood of 'legally significant
confusion.'"  232 F.3d at 2.  So the court of appeals does not
appear to view initial interest confusion, on its own, as a
substitute for likelihood of confusion.  <u>See</u> <u>N. Light Tech., Inc.</u>
<u>v. N. Lights Club</u>, 97 F. Supp. 2d 96, 113 (D. Mass. 2000)
("initial interest confusion . . . is not cognizable under
trademark law in the First Circuit"), <u>aff'd</u>, 236 F.3d 57 (1st
Cir. 2001).  Finally, it is worth noting that the initial
interest confusion doctrine has been criticized as "predicated on
multiple and empirically unsupported assumptions about searcher
behavior" on the Internet, e.g., "that using a trademarked
keyword means that the searcher wanted to find the trademark
owner."  Eric Goldman, <u>Deregulating Relevancy in Internet</u>
<u>Trademark Law</u>, 54 Emory L.J. 507, 555-56 (2005).  That is yet a
further problem with the proof in this case--apart from the one
customer who encountered the "philbricksports.com" site while
looking for the plaintiffs, there is no evidence to suggest how
anyone else ended up there, and thus no basis to assume that they
were necessarily trying to find the plaintiffs' business but
became "lost," even initially.

could be accomplished in a way that would confuse purchasers into
thinking they were dealing with the plaintiffs.

There is also no evidence to tip the sixth factor, actual
confusion, in the plaintiffs' favor, which is significant because
"evidence of actual confusion [is] often deemed the best evidence
of possible future confusion." Attrezzi, 436 F.3d at 40.  Again,
the only customer who actually reported coming across one of the
eNom sites while looking for the plaintiffs knew that the site
was not theirs.  So, while "'even a few incidents' of actual
confusion are 'highly probative of the likelihood of confusion,'"
Beacon Mut. Ins. Co. v. OneBeacon Ins. Group, 376 F.3d 8, 18 (1st
Cir. 2004) (quoting Kos Pharms., Inc. v. Andrx Corp., 369 F.3d
700, 720 (3d Cir. 2004)), here there were no such incidents.  No
consumer "was in fact confused by defendant's trademark" usage.
3 McCarthy, supra, § 23:13, at 23-89--23-90.  Indeed, that one
customer's awareness that the "philbricksports.com" site was not
the plaintiffs' indicates that confusion is not likely.  See
Int'l Ass'n of Machs. & Aerospace Workers v. Winship Green
Nursing Ctr., 103 F.3d 196, 206 n.9 (1st Cir. 1996).

Evaluating the seventh factor, eNom's intent in adopting the
"Philbrick's Sports" mark, is somewhat problematic, due to the
evidentiary gaps noted in the discussion of intentional copying,

53

supra.  Again, as to the "philbricksports.com" and ".net" domain

names, there is nothing to refute eNom's proof that it registered

them because a third party asked it to, nothing to indicate why

the third party made that request, and nothing to explain why

eNom maintained its registration of the ".com" name while

dropping the ".net" variant--and therefore nothing to suggest

that eNom registered or maintained those domain names with the

intent to cause confusion.

    As to the "philbrickssports.net" domain, there is evidence

that eNom registered it due to its perceived ability to attract

traffic.  But that, in and of itself, does not fairly suggest an

attempt to confuse purchasers, for the reasons explained at

length supra.  Cf. Venture Tape, 540 F.3d at 61 (upholding

likelihood of confusion where defendant "admitted that he

intentionally used [plaintiff's] marks on [defendant's] website

for the express purpose of attracting customers to [defendant's]

website and that he chose [plaintiff's mark] because of its

strong reputation").  Even if the record did give a whiff of

intentional confusion, moreover, the court of appeals has pointed

out that such evidence ultimately carries little weight in the

likelihood of confusion analysis because "[s]trictly, intent, or

lack thereof, does not affect the eyes of the viewer."  Chrysler

Corp. v. Silva, 118 F.3d 56, 59 n.3 (1st Cir. 1997); see also

Attrezzi, 436 F.3d at 40 (noting "some distance . . . between a
company's knowing decision to risk a law suit [by using a mark]
and a factual inference that customer confusion is likely").

   Finally, in line with the court's ruling that "Philbrick's
Sports" lacks secondary meaning, the eighth factor, the strength
of the mark, also does not favor likely confusion.  See MJM
Prods., 2003 DNH 159, 22.  This factor depends on "'the length of
time the mark has been used, its renown in the plaintiff's field
of business, and the plaintiff's actions to promote the mark.'"
Beacon Mut. Ins., 376 F.3d at 19 (quoting Star Fin. Servs. v.
Aastar Mtg. Corp.. 89 F.3d 5, 11 (1st Cir. 1996)).  While the
plaintiffs have called their business "Philbrick's Sports" since
1983, their promotional efforts, while not insignificant, were
both geographically limited and modest, at least in a relative
sense.  See Star Fin. Servs., 89 F.3d at 11 (treating "several
thousand dollars per month in advertising" as insufficient to
find that mark was strong).  Moreover, as discussed, there is
simply too little evidence of what really matters:  that these
efforts succeeded in creating consumer awareness of "Philbrick's
Sports" such that confusion was likely to follow from eNom's use
of it.  See Winship Green Nursing Ctr., 103 F.3d at 206.

To overcome summary judgment on the likelihood of confusion issue, a trademark plaintiff must come forward with "significantly probative evidence tending to show that an appreciable number of [customers] were in fact likely to be confused or misled." Id. at 201 (citation and parenthetical omitted). The plaintiffs, despite the obvious similarity between their "Philbrick's Sports" mark and the names of eNom's websites, have not done that. On this basis, as well as on the basis that the plaintiffs also cannot show the distinctiveness of their mark, eNom is entitled to summary judgment on the plaintiffs' claim under § 43(a) of the Lanham Act (Count 3), and their analogous state-law claims (Counts 5-8).[29]

---

[29]The entirety of the plaintiffs' opposition to eNom's motion for summary judgment on these state-law claims is one sentence stating, "[b]ecause Plaintiffs have established a triable issue of fact for trial on their Lanham Act claims the state and common law claims must also survive." The court therefore assumes that the plaintiffs are not pressing any theory of recovery under these state law claims that would not also require them to show the distinctiveness of their mark and a likelihood of confusion between the parties' uses--though, it should be noted, this court has ruled that New Hampshire law recognizes no such theory anyway. See Mueller Co. v. U.S. Pipe & Foundry Co., 2003 DNH 168, 12-13.

### 2.    Count 2 (Cyberpiracy of a personal name)

The plaintiffs have also brought a "cyberpiracy" claim under § 3002(b) of the ACPA.  This statute provides that:

> Any person who registers a domain name that consists of the name of another living person, or a name substantially and confusingly similar thereto, and with the specific intent to profit from such name by selling the domain name for financial gain to that person or any third party, shall be liable in a civil action by such person.

15 U.S.C. § 1129(1)(A).  ENom argues that, because none of the domain names it registered--"philbricksports.com" and ".net" and "philbrickssports.net"--"consists of the name" of Philbrick himself, it cannot be liable under this provision as a matter of law.  Under eNom's view, § 1129(1) applies only when the domain name is "identical to the plaintiff's full name (or his surname, but only when that name is both well-known and rare)."

In response, the plaintiffs do not claim that any of the domain names at issue "consists of the name" of Philbrick, but that they consist of "a name substantially and confusingly similar thereto," i.e., "philbricksports" or "philbrickssports." Requiring the domain name to be "identical" to the plaintiff's name, they argue, reads the phrase "substantially and confusingly similar thereto" out of the statute, in derogation of principles of statutory construction.  See, e.g., Me. People's Alliance &

57

Natural Res. Def. Council v. Mallinckrodt, Inc., 471 F.3d 277,
290 (1st Cir. 2006), cert. denied, 128 S. Ct. 93 (2007).

There does not appear to be any case law interpreting this
aspect of § 1129(1)(A).  ENom relies on a handful of successful
cases under the statute which arose out of domain names identical
to the plaintiff's name, see, e.g., Salle v. Meadows, 07-cv-1089,
2007 WL 4463920 (M.D. Fla. 2007) ("briansalle.com"); Schmidheiny
v. Weber, 285 F. Supp. 2d 613, 627 (E.D. Pa. 2003)
("schmidheiny.com," which "consists of the name of Stephan
Schmidheiny, a living person"), but the fact that these claims
succeeded does not mean, or even imply, that a claim arising out
of a domain name not precisely identical to the plaintiff's would
fail.  See Doe v. Friendfinder Network, Inc., 540 F. Supp. 2d
288, 306 (D.N.H. 2008) (rejecting similar reasoning in a
different context).  The court need not resolve the precise scope
of § 1129 here, however, because "philbricksports" (with one "s"
or two) is not "substantially and confusingly similar" to the
name "Daniel Philbrick."

The configuration of the domain name "philbricksports" is
not "substantially similar" to that of the name "Daniel
Philbrick," in that the former omits the Philbrick's first name
and tacks the word "sports" on to the end.  Furthermore, even the

58

most careless viewer would not mistake the word "philbricksports"
for the words "Daniel Philbrick," so the two are also not
"confusingly similar."  This is to be distinguished from whether
a visitor to one of eNom's "philbricksports" sites would be
confused as to its affiliation with Philbrick's business (though,
as just discussed supra, that inquiry also does not resolve in
the plaintiffs' favor), because § 1129 requires the names--not
their uses--to be "substantially and confusingly similar to" each
other.[30]

Thus, if eNom had registered domain names like
"danelphilbrick" or "danielphilbric," it would (assuming the
requisite "specific intent" could be proven) face liability,
because those names are "substantially similar and confusing to"
the name "Daniel Philbrick."  The name "philbricksports,"
however, is not.  ENom is entitled to summary judgment on the
plaintiffs' cyberpiracy claim under 15 U.S.C. § 1129.

---

[30]Also a different question is whether consumers perceive
the word "Philbrick," as it appears in the mark "Philbrick's
Sports," to be a personal name.  See Part II.B.1.a.ii, supra.
Contrary to the plaintiffs' suggestion, then, it is not
inconsistent to answer that question "yes" but answer "no" to the
question of whether the domain name "philbricksports" is
"substantially similar and confusing to" the personal name
"Daniel Philbrick."

### 3.    Count 4 (False advertising)

ENom also seeks summary judgment on the plaintiffs' claim for false advertising under § 43(b) of the Lanham Act.  That statute provides, in relevant part, that:

> Any person who, on or in connection with any goods or services . . ., uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which--
>
>          . . .
>
>          (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,
>
> shall be liable in a civil action by any such person who believes that he or is she is likely to be damaged by such act.

15 U.S.C. § 1125(a)(1).  ENom argues that the plaintiffs cannot demonstrate a triable issue as to whether it made any "false or misleading representation of fact" or, independently, whether the plaintiffs were damaged as a result.

In response, the plaintiffs claim that the phrase "Welcome to Philbricksports.com," as it (or one of its variants) appeared on the sites associated with the domain names registered to eNom,

was "false on its face."  The term of art "false on its face"
describes a statement that is "literally false" as opposed to
"literally true or ambiguous but likely to mislead and confuse
consumers."  <u>Clorox Co. P.R. v. Proctor & Gamble Commercial Co.</u>,
228 F.3d 24, 33 (1st Cir. 2000).  The significance of this
distinction is that a plaintiff may recover under § 43(b) for a
literally false statement without having to prove that it
actually deceived consumers, while actual deception is an
additional element of proof on a claim arising out of a literally
true or ambiguous statement.  <u>See</u> <u>Cashmere & Camel Hair Mfrs.
Inst. v. Saks Fifth Ave.</u>, 284 F.3d 302, 311 (1st Cir. 2002).[31]

    The plaintiffs do not explain how the statement "Welcome to
Philbrickports.com" is literally false, and the proposition is
not apparent to the court.  On its face, the statement simply
welcomes the viewer to a <u>website</u> named "Philbricksports.com,"
which, after all, is literally true in the sense that
"philbricksports.com" is the name of the website.  The statement
may well suggest (though, as discussed <u>supra</u>, not in a context

---

[31]This rule applies where a plaintiff seeks money damages
under § 43(b); "a plaintiff seeking injunctive relief . . . only
has to show that the misrepresentation had the tendency to
deceive," in line with the "likely to be damaged" standard of
§ 43(b).  <u>Cashmere & Camel Hair Mfrs. Inst.</u>, 284 F.3d at 311 n.9.
Given the parties' agreement that the eNom sites are no longer in
operation, any claim for injunctive relief is moot by now, so the
plaintiffs must show actual deception to recover under § 43(b).

likely to confuse consumers) that the site is affiliated with a
business named "Philbrick's Sports," but "claims that are
implicit, attenuated, or merely suggestive usually cannot fairly
be characterized as literally false."[32]  Id. at 315 (internal
quotation marks omitted).  The plaintiffs, then, must prove that
the statement caused actual deception among consumers in order to
recover on their false advertising claims.  Id. at 311.

    The summary judgment record, as already noted a number of
times, is devoid of proof that anyone who encountered the eNom
sites believed they had anything to do with the plaintiffs;
again, the sole person known to have visited any of the sites did
not believe that it belonged to the plaintiffs, despite the
"Welcome to Philbricksports.com" representation.  Without any
proof of actual deception, eNom is entitled to summary judgment
on the plaintiffs' false advertising claim (count 4).

_____

    [32]This is "usually" the case because a factfinder assessing
literal falsity "may also consider any claims the advertisement
conveys by necessary implication."  Cashmere & Camel Hair Mfrs.
Inst., 284 F.3d at 314-315.  The plaintiffs have not made any
argument as to the "necessary implication" of the statement--an
inquiry calling for a subtle and fact-intensive analysis in its
own right, see id. at 315-316--so the court has not considered
that theory here.  "A party who aspires to oppose a summary
judgment motion must spell out his arguments squarely and
distinctly . . . .  The district court is free to disregard
arguments that are not adequately developed."  Higgins v. New
Balance Ath. Shoe, Inc., 194 F.3d 252, 260 (1st Cir. 1999).

### 4.    Count 9 (False light invasion of privacy)

As the ninth and final count of their amended complaint, the plaintiffs allege that eNom cast Philbrick in a false light by associating him with "the marketing or advertisement of pornography" via the domain names registered to eNom.  ENom seeks summary judgment on this count on a number of grounds, including that (1) New Hampshire has not recognized a cause of action for false light invasion of privacy, (2) the count is barred by eNom's claimed immunity, under the Communications Decency Act of 1996, 47 U.S.C. § 230(c)(1), as a "provider or user of an interactive computer service" from liability for "information provided by another information content provider," on the theory that Yahoo!, not eNom, provided the content, (3) because Philbrick is a public figure, he must prove actual malice to recover, which he cannot, and (4) eNom did not give publicity to any matter concerning Philbrick.

While eNom's first three arguments raise interesting issues, the court need not reach them, because eNom is correct that, as a matter of law, it did not publicize the matter which allegedly cast Philbrick in a false light.  As the plaintiffs emphasize, this court has predicted that the New Hampshire Supreme Court would recognize a cause of action for false-light invasion of

63

privacy as endorsed by the Restatement (Second) of Torts § 652D
(1977).  See O'Neill v. Valley Reg'l Health Care, Inc., 2001 DNH
054, 6-7.  As this court observed there, the elements of the tort
as defined by the Restatement include "publicity," which "means
that the matter is made public by communicating it to the public
at large, or to so many persons that the matter must be regarded
as substantially certain to become one of public knowledge."
Restatement (Second) of Torts § 652D  cmt. a. (1977).

It is undisputed that Philbrick and, acting at his
direction, his employees and counsel, were the only people who
typed "sex" or "adult" into the search function on any of the
eNom websites and, as a result, were the only people who were
exposed to the claimed association between Philbrick and the
objectionable content.  So the allegedly tortious matter was
neither communicated to the public at large, nor enough of them
to treat it as substantially certain that the matter would become
publicly known.  See O'Neill, 2001 DNH 054, 7 (ruling that
"communications within the workplace among employees or to
supervisors or officers of the employer do not constitute
publicity" about an employee); Restatement (Second) of Torts
§ 652D  cmt. a. (1977) ("It is not an invasion of privacy . . .
to communicate a fact . . . to a single person or even to a small

64

group of persons.").[33]  Because the plaintiffs have not shown a
triable issue as to whether eNom gave publicity to the material
allegedly casting Philbrick in a false light, the defendants are
entitled to summary judgment.


**IV.  Conclusion**

    For the foregoing reasons, eNom's motion for summary
judgment (document no. 49) is GRANTED.  ENom is also GRANTED
summary judgment on the plaintiffs' claims arising out of the
"philbrickssports.com" domain name.  Plaintiffs' motion for
summary judgment on ACPA Claim (Count I) (document no. 51) is
DENIED.  <u>See</u> note 19, <u>supra</u>.  The plaintiffs' motion to strike

---

    [33]As the <u>Restatement</u> provides, "publication" through the
media, such as newspapers, magazines, and radio broadcasts,
suffices to show publicity.  While this logic generally extends
to publication over the Internet, the problem here is that the
objectionable matter did not appear anywhere an Internet user
would have visited while looking for Philbrick or his business;
it was necessary, first, for such a person to stumble across one
of the eNom sites (and, again, there is evidence of that
happening only once) and, second, for that person--who is there,
in this hypothetical, looking for sporting goods, not adult
content--to type "sex" or "adult" into the search box.  Under
these circumstances, the simple appearance of the allegedly
tortious matter on a website cannot justify presuming that it was
given "publicity" in the way that presumption attaches to other
forms of media.  <u>Cf.</u> <u>Steinbuch v. Cutler</u>, 463 F. Supp. 2d 1, 4
(D.D.C. 2006) (recognizing invasion of privacy claim based on
statements in blog that were "publicly available").  The
plaintiffs offer no authority or argument to the contrary.

Ursini's declaration (document no. 90) is DENIED.  The other motions to strike (document nos. 75 and 85) are DENIED as moot. All pending trial motions (document nos. 26-28, 36-39) are also DENIED as moot.  The plaintiffs' motion to compel responses to discovery (document no. 32) is DENIED as moot.  The plaintiffs' motion for sanctions (document no. 95) is DENIED.  <u>See</u> note 23, <u>supra</u>.  The clerk shall enter judgment accordingly and close the case.

      **SO ORDERED.**

_____
Joseph N. Laplante
United States District Judge

Dated: January 22, 2009

cc:  Kevin M. Fitzgerald, Esq.
     Courtney Quinn Brooks, Esq.
     Jeffrey P. Dunning, Esq.
     Paul D. McGrady, Esq.
     Jason B. Elster, Esq.
     Daniel D. Rubinstein, Esq.
     Steven M. Gordon, Esq.